STATE OF CONNECTICUT *v.* ANTHONY
E. PATTERSON
(SC 17367)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued April 14—officially released December 20, 2005

*Elizabeth M. Inkster*, senior assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *James M. Bernardi*, supervisory assistant state's attorney, and *Richard Colangelo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Anthony E. Patterson, guilty of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a)[1] and 53a-48 (a).[2] In accordance with the jury's verdict and the jury's additional findings regarding the commission of a class A, B or C felony with a firearm, the trial court rendered judgment of conviction and enhanced the defendant's sentence pursuant to General Statutes § 53-202k.[3] On appeal,[4] the defendant claims that the trial court improperly: (1) denied his motion for a judgment of acquittal on the ground that the evidence was insufficient to support the jury's verdict of guilty on the charge of conspiracy to commit murder; (2) declined to instruct the jury specially regarding the credibility of a jailhouse informant; (3) concluded that the jury's findings war-

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

Murder generally is a class A felony. See General Statutes § 53a-54a (c).

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[3] General Statutes § 53-202k provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm . . . shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[4] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

ranted the imposition of a sentence enhancement pursuant to § 53-202k; (4) permitted the state to adduce testimony concerning an out-of-court statement of the victim; and (5) declined to allow him access to certain mental health records of the jailhouse informant. Although we conclude that the evidence was sufficient to support the jury verdict on the charge of conspiracy to commit murder, we also conclude that the trial court improperly declined to instruct the jury specially on the credibility of the jailhouse informant and that that impropriety was harmful. We further conclude that the trial court improperly imposed a sentence enhancement pursuant to § 53-202k because the jury's findings were insufficient to support the imposition of such an enhancement. Accordingly, we reverse the judgment of the trial court, vacate the trial court's enhancement of the defendant's sentence and remand the case for a new trial on the charge of conspiracy to commit murder.

The following evidence was adduced at trial. On November 27, 2001, at approximately 10:45 p.m., police officers were dispatched to the Roodner Court housing complex at 261 Ellis Avenue in Norwalk to investigate a shooting. The officers entered through the front door of building sixteen of that complex and found the victim, David Rowley, lying at the bottom of a stairway that led to the third floor apartment of his girlfriend, Miriam Montanez. The victim had been shot several times in the chest and abdomen, and was unconscious when the police arrived. The victim could not be revived and died from the gunshot wounds.

The state elicited testimony from several witnesses about the events leading up to and culminating in the victim's death. Montanez testified that, on November 22, 2001, she and the victim were driving on South Main Street in Norwalk when she observed the defendant standing on the side of the street with a group of people that included Aki Johnson and Craig Holloway. Mon-

tanez recounted that, as they were driving past the group, she observed Johnson strike a person named "Curtis" on the head. Montanez then saw Curtis pull out a gun and shoot Johnson. According to Montanez, everyone on the street fled after the shooting, except for the victim, who got out of his vehicle, called an ambulance and attended to Johnson, who ultimately survived.

Montanez testified that the next day, as she and the victim were preparing to leave a store parking lot in Norwalk, they discovered that the victim's truck had been blocked in by two cars parked behind it. Montanez further testified that she had observed Holloway, Kevin Preston, Leon Hilliard and the defendant inside those two cars.[5] According to Montanez, although the victim eventually managed to maneuver his truck around the two cars, his demeanor changed after the incident, and he appeared to be upset. Montanez asked the victim "what was wrong?" The victim replied, "they're trying to put this thing about [Johnson] on [me]."

Montanez also testified that, on November 27, 2001, the day the victim was fatally shot, she and the victim had left the Roodner Court housing complex at approximately 6 p.m. to take a drive in the victim's truck. Upon returning home, Montanez went upstairs to her apartment while the victim parked his vehicle next to the sidewalk in front of Montanez' building. Montanez further testified that the victim had stopped in the park-

[5] During direct examination, Montanez testified that she only recalled seeing Holloway and Preston, and that they were the only two persons who had exited from the vehicles that were blocking the victim's truck. Montanez, however, had given a statement to the police shortly after the victim's murder in which she indicated that the defendant also was present. The court permitted the state to introduce that statement into evidence and instructed the jury that it could consider both Montanez' trial testimony and her prior written statement. In addition, on cross-examination, Montanez stated that she was "pretty sure" that she had seen the defendant in one of the vehicles even though the windows were "tinted out."

ing lot for several minutes to speak with Jason Miller before proceeding up to her apartment.

Thereafter, at approximately 10:30 p.m., Miller knocked on the door of Montanez' apartment. Montanez' sister, Diana Ramos, who was living with Montanez at the time, answered the door, and Miller asked to see the victim, who by then was asleep on the living room couch. Ramos testified that she had invited Miller into the apartment. Ramos further explained that Miller woke up the victim to inform him that the police were "[m]essing" with his car. Miller left the apartment once he had awakened the victim.

Montanez was getting into the shower when Miller arrived and heard Miller speaking to the victim in a loud voice. According to Montanez, "[t]he way [Miller] was yelling [at the victim] made [her] suspicious" because she "knew that people were blaming [the victim] for the shooting of . . . [Johnson], so [she] was a little nervous." Montanez also reported that, upon hearing Miller's voice, she "put [her] clothes back on and looked out the living room window and saw [the victim's truck], but not [any] cops." Montanez testified that, although she had told the victim that his truck seemed all right, he decided to move it anyway, just to be sure that it would not be ticketed or towed. A few moments after the victim left the apartment, Montanez heard several gunshots and ran downstairs with Ramos and Joel DeLeon, a cousin of Montanez who also was staying at Montanez' apartment. They discovered the victim's body at the bottom of the stairs. At that time, Montanez noticed that one of the doors to the building was propped open by a long, wooden stick.

Jenenene Addison, a resident of the Roodner Court housing complex at the time of the fatal shooting, testified that, at approximately 9:30 p.m. that night, she had seen the defendant and Miller standing in front of

building seventeen of the complex. Addison testified that she had greeted the defendant and had asked to borrow $3 from him. Approximately one hour later, while standing outside building sixteen, Addison heard gunshots inside the building. Immediately after hearing the shots, Addison saw Miller come out of the building, alone, with his head down. Addison explained that Miller had walked directly into the parking lot and then to building fifteen. Addison also testified that she had not seen the defendant anywhere in the vicinity at the time of the shooting. Immediately after seeing Miller leave building sixteen, Addison walked over to that building, entered, and observed the victim lying in the first floor hallway.

Addison further testified that the defendant had come to her apartment to speak to her approximately seventy-five minutes after the shooting. Addison stated that the defendant was worried about her because someone had told him that she was "kind of upset that [she] may have seen what happened." The defendant asked her if she had seen the shooting, and Addison told him that she had not. The defendant then told Addison not to worry, and that everything was going to be all right. Addison testified that she always had had a friendly relationship with the defendant, and that they had not had any problems. Addison stated that, although she and the defendant were "not cousins . . . that's how everybody is out there." Addison further testified that it was her understanding, based on a conversation that she once had had with Johnson, that the defendant and Johnson were, in fact, cousins.

The defendant was arrested on December 4, 2001, and charged in connection with the victim's murder.[6]

---

[6] The defendant was arrested on the basis of information that Miller had provided. Miller was arrested on November 28, 2001, in connection with the victim's murder.

The defendant was unable to make bail and, therefore, was incarcerated pending trial. For approximately seven months following his arrest, the defendant shared a cell at the Cheshire correctional institution with Leonard McGahee.

McGahee testified that he and the defendant had had several conversations about the victim's murder and that the defendant had told McGahee that he had killed the victim.[7] McGahee also stated that the defendant had told him "that, on a previous occasion, he was out with [Miller] and that there was a crowd and [the victim] had shot into the crowd" and wounded "one of his people."[8]

McGahee further testified that the defendant had told him that, after that shooting, the defendant had sought advice about what to do from "a partner of his" by the name of Bret. The defendant told McGahee that "he took the advice of his partner" and "handle[d] his business with [the victim]." In that regard, McGahee testified that the defendant also had told him that, on the night that the victim was fatally shot, the defendant and Preston had waited outside the side door of building sixteen of the Roodner Court housing complex while Miller lured the victim downstairs. When the victim appeared, the defendant shot him three times in the chest.

McGahee also explained that the defendant had confided in him that, after shooting the victim, the defendant and Preston fled the scene together in the defendant's truck. Miller fled the area in a second vehicle. According to McGahee, the defendant took Preston to a hotel to "get him squared away and calmed down" because Preston was "going through all kind[s] of emo-

[7] McGahee testified pursuant to an agreement with the state. The terms of that agreement are set forth in part II of this opinion.

[8] McGahee subsequently explained that "one of [his] people means . . . family."

tional stuff" and was "rattled" over the shooting. The defendant then went back to the Roodner Court housing complex "so that folks would see him and it would appear that he was just arriving." McGahee testified that the defendant also told him that "he got cleaned up and changed clothes" and that "he had used . . . bleach to make sure that no bullet residue and stuff was on him." The defendant also told McGahee that he had hidden the murder weapon at his girlfriend's house and had spent the night there.

The state charged the defendant with murder and conspiracy to commit murder. A jury found the defendant guilty of conspiracy to commit murder but not guilty of murder. The jury also made certain findings with respect to the state's allegation that the defendant had violated § 53-202k. The trial court thereafter sentenced the defendant to a term of imprisonment of eighteen years on the charge of conspiracy to commit murder and a consecutive five year enhancement pursuant to § 53-202k, for a total effective prison term of twenty-three years. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion for a judgment of acquittal because the evidence was insufficient to support his conviction of conspiracy to commit murder. We reject the defendant's claim.

Before addressing the merits of the defendant's claim, we set forth the legal principles that govern our review. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the

cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 146–47, 869 A.2d 192 (2005).

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) Id., 147. Thus, "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002).

To establish the crime of conspiracy under § 53a-48, "the state must show that there was an agreement

between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Garner*, 270 Conn. 458, 476, 853 A.2d 478 (2004).

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement." (Internal quotation marks omitted.) Id. "[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 669, 804 A.2d 810 (2002).

Construed in the light most favorable to the state, the evidence was sufficient to permit a finding beyond a reasonable doubt that the defendant had conspired to murder the victim. According to McGahee, the defendant indicated that he believed that the victim had shot Johnson and that, after discussing that shooting with his "partner," the defendant had decided to kill the victim. McGahee also testified that the defendant had told him that, on the night of the murder, the defendant and Preston waited outside one of the doors to Montanez' apartment building while Miller lured the victim downstairs. McGahee further testified that the defendant had admitted to shooting the victim.

Other evidence tended to corroborate certain aspects of the defendant's statements to McGahee. For example, Montanez testified that the defendant was a passenger in one of the two vehicles that blocked in Montanez and the victim, and that the victim had stated, with respect to the occupants of those two vehicles, that they blamed the victim for the Johnson shooting. According to Addison, Johnson and the defendant were related. Addison further testified that she had seen the defendant in front of building seventeen of the Roodner Court housing complex approximately one hour before the shooting, and that the defendant also had appeared at her apartment in that housing complex approximately seventy-five minutes after the fatal shooting. Although this testimony, standing alone, would have been insufficient to permit a finding that the defendant had conspired to murder the victim, the entirety of the evidence, including the defendant's statements to McGahee, was adequate to warrant such a finding.

The defendant contends that there was insufficient evidence to establish that he had agreed with others to murder the victim. In support of this contention, the defendant notes that the jury, having found the defendant not guilty of murder, necessarily concluded that he personally did not shoot the victim, and that the other evidence adduced by the state does not demonstrate that the defendant otherwise was involved as a coconspirator in that fatal shooting. The defendant's argument ignores the fact that the jury was free to believe some but not all of McGahee's testimony. See, e.g., *State* v. *Meehan*, supra, 260 Conn. 381 (within province of jury to believe some or all of witness' testimony); *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994) (same). Thus, the jury was entitled to credit McGahee's testimony that the defendant had told him that he and Preston had waited outside building sixteen of the Roodner Court housing complex while Miller lured the

victim downstairs, and to discredit McGahee's testimony that the defendant acknowledged that he had shot the victim. In other words, the jury reasonably could have concluded that the defendant was actively involved in the planning and execution of the victim's murder but that he did not actually shoot the victim. Accordingly, the evidence was sufficient to support the jury's finding that the defendant had conspired to kill the victim.

## II

The defendant next claims that the trial court improperly declined to instruct the jury that it should view McGahee's testimony with caution in light of the benefits that the state had promised McGahee in exchange for his cooperation as a jailhouse informant. The defendant further claims that the trial court's failure to give such an instruction was harmful because McGahee's testimony was central to the state's case against the defendant. We agree with both of the defendant's contentions.

The following additional facts and procedural history are necessary to our resolution of this issue. At trial, McGahee testified that he has been convicted of various felony offenses, including larceny, robbery, assault and failure to appear. In addition, McGahee acknowledged that he had a long history of using aliases and giving false statements when arrested. At the time of the defendant's trial, McGahee was serving a sentence in this state for first degree robbery, and he recently had had his visitation privileges restricted for stealing from another inmate, possessing contraband and abusing his telephone privileges. According to McGahee, he also had narcotics charges pending against him in this state, as well as burglary and conspiracy charges pending against him in New Jersey.

McGahee further testified that shortly before the defendant's trial, two Norwalk police officers contacted him in prison and inquired about whether the defendant had made any incriminating statements to him while he and the defendant were cellmates. According to McGahee, he told the officers that he would assist them only if he received certain benefits in return. In particular, McGahee testified that, in exchange for his cooperation, he sought and ultimately was promised a two year reduction in the sentence that he then was serving for his robbery conviction, a favorable recommendation with respect to the disposition of his pending narcotics charges, assistance in obtaining early parole, a transfer to another prison and restoration of his visitation privileges.[9]

Prior to the conclusion of the trial, the defendant filed with the court several requests to charge, including a proposed instruction pertaining to McGahee's credibility as a jailhouse informant. In particular, the defendant requested the court to instruct the jury that, in evaluating McGahee's testimony, the jury should consider the benefits that the state had promised McGahee in exchange for his cooperation. The defendant further requested that the court advise the jury that McGahee's testimony "be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness." In support of the requested instruction, the defendant argued that such an instruction was necessary due to the critical nature of McGa-

---

[9] McGahee also testified that he and the defendant had gotten along well as cellmates until prison guards found narcotics in their cell. McGahee thereafter was charged with possession of heroin, cocaine and marijuana in connection with that incident. According to McGahee, the drugs belonged to the defendant, and McGahee believed that the defendant should have taken responsibility for them. McGahee further testified that, before he had been approached by the police regarding his possible cooperation, he reviewed a copy of the defendant's arrest warrant, which the defendant had showed him when they were cellmates.

hee's testimony, the lack of corroborating evidence substantiating that testimony and McGahee's motive to incriminate the defendant falsely in light of the benefits that he had been promised in return for his testimony. The trial court denied the defendant's request, concluding that the court's general instructions on credibility were adequate to guide the jury in evaluating McGahee's testimony.[10]

We begin our analysis by setting forth the legal principles that guide our review of the defendant's claim. "It is a well established principle that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . The charge must be correct in the law, adapted to the issues and sufficient to guide the jury. . . . The primary purpose of the charge to the jury is to assist [it] in applying the law correctly to the facts which [it] find[s] to be established." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 560–61, 747 A.2d 487 (2000). "[A] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component

---

[10] The trial court thereafter instructed the jury as follows with respect to the possible bias or motive of witnesses generally: "In weighing the testimony of a witness, you should consider his or her demeanor on the witness stand, whether his or her testimony was reasonable or unreasonable, the basis of the witness' knowledge or opportunity to observe the events that he or she testified about, whether his or her testimony was supported or contradicted by other testimony, his or her motive to tell the truth or not to tell the truth, the probability or improbability of his or her testimony. . . .

"You also have a right to consider whether any witness has shown bias or prejudice or has a personal interest or professional interest in the outcome of the case which might cause him or her to testify to something other than the truth or to color or embellish his or her testimony. However, even if you find that the witness is an interested witness, has some stake in the matter, remember, there's no legal presumption that he or she did not tell the truth nor is there any legal presumption that a disinterested witness did, in fact, tell the truth. The question of the interest of a witness and the effect upon his or her testimony is for you to decide from the evidence in the case."

parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Dorans*, 261 Conn. 730, 740, 806 A.2d 1033 (2002). "Although [a] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given . . . [a] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance. . . . Thus, when the substance of the requested instructions is fairly and substantially included in the trial court's jury charge, the trial court may properly refuse to give such instructions." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 22, 818 A.2d 1 (2003).

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." *State* v. *Ortiz*, supra, 252 Conn. 561; accord *State* v. *Colon*, 272 Conn. 106, 227, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). We have recognized two exceptions to this general rule, however: the complaining witness exception and the accomplice exception. See, e.g., *State* v. *Ortiz*, supra, 561. Under the complaining witness exception, when "the complaining witness [himself] could . . . have been subject to prosecution depending only upon the veracity of his account of [the] particular criminal transaction, the court should . . . [instruct] the jury in substantial compliance with the defendant's request to charge to determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused." *State* v. *Cooper*, 182 Conn. 207, 211–12, 438 A.2d 418 (1980). "In order for [such a] request to be applicable to the issues in the case, there

must be evidence . . . to support the defendant's assertion that the complaining witness was the culpable party." Id., 212.

With regard to accomplice witnesses, we have stated that, "[w]here it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if [he] assisted or aided or abetted in the commission, of the offense with which the defendant is charged." (Emphasis in original; internal quotation marks omitted.) *State* v. *Colon,* supra, 272 Conn. 227. "[I]n order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose." (Internal quotation marks omitted.) Id.

With respect to the credibility of accomplices, we have observed that "the inherent unreliability of accomplice testimony ordinarily requires a particular caution to the jury [because] . . . [t]he conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he testifies. When those conditions exist, it is the duty of the [court] to specially caution the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton,* 174 Conn. 135, 140, 384 A.2d 343 (1977). Similarly, we have stated, with respect to the credibility of certain complaining witnesses, that, because a complaining witness can be subject to prosecution "depending only upon the veracity of his account of [the] particular criminal transaction, the court should . . . [instruct] the jury in substantial compliance with the defendant's request to charge to determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused." *State* v. *Cooper,* supra, 182 Conn. 211–12.

Because McGahee was neither a complaining witness nor an accomplice, the defendant does not contend that

he was entitled to a special credibility instruction under either of those two exceptions to the general rule discouraging such instructions. Rather, the defendant urges us to create a third exception to that general rule for informants who, like McGahee, provide testimony for the state in return for consideration from the state. In essence, the defendant contends that the rationale underlying the requirement of a special credibility instruction in cases involving accomplice and complainant testimony, namely, the fact that the accomplice or complaining witness has a powerful motive to falsify his or her testimony, applies with equal force to an informant who has been promised a reduction in his sentence or other valuable consideration by the state in return for his testimony against the accused.

We agree with the defendant that an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect. As the United States Supreme Court observed more than fifty years ago, "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee* v. *United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952). The United States Supreme Court therefore has "allowed defendants 'broad latitude to probe [informants'] credibility by cross-examination' and ha[s] counseled submission of the credibility issue to the jury *'with careful instructions.'* " (Emphasis added.) *Banks* v. *Dretke*, 540 U.S. 668, 702, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004), quoting *On Lee* v. *United States*, supra, 757; see *Hoffa* v. *United States*, 385 U.S. 293, 311–12, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966). Indeed, the court recently has

characterized such instructions as one of the "customary, truth-promoting precautions that generally accompany the testimony of informants." *Banks* v. *Dretke*, supra, 701. Because the testimony of an informant who expects to receive a benefit from the state in exchange for his or her cooperation is no less suspect than the testimony of an accomplice who expects leniency from the state,[11] we conclude that the defendant was entitled to an instruction substantially in accord with the one that he had sought.[12]

The state relies on *State* v. *Santiago*, 48 Conn. App. 19, 708 A.2d 969, cert. denied, 245 Conn. 901, 719 A.2d

[11] The state contends that a special credibility instruction is necessary in the case of an accomplice who has been promised leniency in return for his cooperation, but not in the case of an informant who has been promised a benefit for his cooperation, because the testimony of the former is likely to be more powerful and persuasive than that of the latter. The state's argument misses the point. The primary reason why a special credibility instruction is necessary with respect to both categories of witnesses is because both such witnesses have an unusually strong motive to implicate the accused falsely. Moreover, although it is true that the testimony of an accomplice often is very damaging to the accused, we have observed that testimony about an admission of guilt by the accused may be "the most damaging evidence of all . . . ." *State* v. *Vaughn*, 171 Conn. 454, 460, 370 A.2d 1002 (1976); see also *State* v. *Ruth*, 181 Conn. 187, 199, 435 A.2d 3 (1980) (defendant's confession is "the most damaging evidence of guilt").

[12] Our conclusion finds support in the case law of multiple jurisdictions. See, e.g., *United States* v. *Prawl*, 168 F.3d 622, 627–29 (2d Cir. 1999); *United States* v. *Angiulo*, 897 F.2d 1169, 1208 (1st Cir.), cert. denied sub nom. *Granito* v. *United States*, 498 U.S. 845, 111 S. Ct. 130, 112 L. Ed. 2d 98 (1990); *United States* v. *Goff*, 847 F.2d 149, 161 (5th Cir.), cert. denied sub nom. *Kuntze* v. *United States*, 488 U.S. 932, 109 S. Ct. 324, 102 L. Ed. 2d 341 (1988); *United States* v. *Shearer*, 794 F.2d 1545, 1551 (11th Cir. 1986); *People* v. *Dela Rosa*, 644 F.2d 1257, 1259–60 (9th Cir. 1980); *Moore* v. *State*, 787 So. 2d 1282, 1286 (Miss. 2001); *Dodd* v. *State*, 993 P.2d 778, 784 (Okla. Crim. App. 2000); see also 2 K. O'Malley, J. Grenig & W. Lee, Federal Jury Practice and Instructions (5th Ed. 2000) § 15.02, pp. 364–80. But see *United States* v. *Cook*, 102 F.3d 249, 252 (7th Cir. 1996) (declining to adopt rule requiring special instruction regarding credibility of informant who has been promised benefit by state in exchange for testimony); *United States* v. *Ridinger*, 805 F.2d 818, 820–22 (8th Cir. 1986) (same); *Parrish* v. *Commonwealth*, 121 S.W.3d 198, 203 (Ky. 2003) (same), cert. denied, 541 U.S. 1050, 124 S. Ct. 2180, 158 L. Ed. 2d 746 (2004); *Lovitt* v. *Warden*, 266 Va. 216, 252,

1164 (1998), to support its contention that the trial court properly declined to instruct the jury specially regarding McGahee's credibility as a jailhouse informant. In *Santiago*, the defendant, Ruben Santiago, an inmate at the state correctional facility in Enfield (facility), was charged with various offenses stemming from his involvement in a riot at that facility. Id., 22–23. At trial, the state adduced the testimony of Walter Gouch, who also was an inmate incarcerated at the facility at the time of the riot. See id., 26. Santiago sought an instruction directing the jury to scrutinize Gouch's testimony with care because it appeared that Gouch may have received some consideration from the state for his testimony against Santiago.[13] See id., 23. The Appellate Court rejected Santiago's claim, concluding that Santiago was not entitled to the requested instruction because Gouch was neither a complaining witness nor an accomplice; see id., 31–32; the only two categories of witnesses for whom this court previously had required a special credibility instruction. To the extent that Gouch was an informant who received benefits from the state in exchange for his cooperation with the state, we overrule the Appellate Court's determination in *Santiago* that a special credibility instruction was not warranted in that case.

Having concluded that the trial court improperly declined to give the requested jury instruction, we next must decide whether the impropriety was harmful. As we previously have recognized, an instructional error relating to general principles of witness credibility is not constitutional in nature. E.g., *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997). Consequently, the

---

585 S.E.2d 801 (2003) (same), cert. denied sub nom. *Lovitt* v. *True*, 541 U.S. 1006, 124 S. Ct. 2018, 158 L. Ed. 2d 523 (2004).

[13] Santiago claimed that Gouch had received a promise of early parole from the prosecuting authorities in return for his cooperation against Santiago. *State* v. *Santiago*, supra, 48 Conn. App. 23.

defendant bears the burden of establishing that the error deprived him of his due process right to a fair trial. See, e.g., *State* v. *Cooper*, supra, 182 Conn. 212.

Several factors guide our determination of whether the trial court's failure to give the requested instruction was harmful. These considerations include: (1) the extent to which McGahee's apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature of the court's instructions on witness credibility; (3) whether McGahee's testimony was corroborated by substantial independent evidence; and (4) the relative importance of McGahee's testimony to the state's case. See id., 213–15; *State* v. *Ruth*, 181 Conn. 187, 199–200, 435 A.2d 3 (1980). Upon application of these factors, we are persuaded that the error was harmful.

With respect to the first consideration, the jury was well aware of the fact that McGahee had been promised certain benefits by the state in return for his cooperation against the defendant. Indeed, the assistant state's attorney elicited testimony from McGahee on direct examination regarding those promises, and defense counsel cross-examined McGahee extensively about the benefits that he had expected to receive from the state for his cooperation.[14]

With respect to the second factor, the trial court's instructions included an admonition that the jury, in evaluating the credibility of a witness, should consider any possible motive, bias or personal interest of any such witness. See footnote 10 of this opinion. Those instructions, however, were not extensive, and they contained no reference to McGahee specifically. More-

[14] McGahee also was questioned extensively, both on direct and cross-examination, regarding his criminal history. In addition, the trial court instructed the jury that it could consider McGahee's felony convictions and other misconduct in evaluating his credibility.

over, the court's instructions also included no specific mention of the fact that the credibility of a witness must be considered in light of any benefits that the state has promised such witness in return for his or her cooperation.

The third and fourth factors, which we consider together, militate strongly in favor of the defendant's contention that the instructional error deprived him of a fair trial. McGahee's testimony was the only evidence adduced by the state that directly implicated the defendant in a conspiracy to kill the victim. Although it is true that the state presented other evidence that was consistent with certain limited aspects of McGahee's testimony, that corroborative evidence, considered as a whole and viewed in the light most favorable to the state, would have been insufficient to support a guilty finding. In other words, in the absence of McGahee's testimony detailing the defendant's alleged confession, the jury reasonably could not have found the defendant guilty. Moreover, as we previously have noted, evidence regarding an accused's admission of guilt generally is extremely important to the state and damaging to the accused. See footnote 11 of this opinion. Because McGahee's testimony was so critical to the state's case, and because the other evidence on which the state relied was so weak, we cannot say that the trial court's failure to charge the jury specially regarding McGahee's credibility was harmless. We conclude, therefore, that the defendant has met his burden of establishing that he is entitled to a new trial.

III

The defendant next claims that the trial court improperly concluded that he was subject to a mandatory five year sentence enhancement pursuant to § 53-202k because the jury had failed to make a finding that he had used a firearm during the commission of the crime

of conspiracy to commit murder. The state concedes that the jury did not make such a finding but maintains that the facts that the jury actually had found, namely, that one of the defendant's coconspirators had used a firearm during the commission of the offense, were sufficient to warrant the imposition of a sentence enhancement under § 53-202k. We agree with the defendant.

The following additional facts are necessary for our resolution of this claim. The state filed a substitute information charging the defendant, in count one, with the crime of murder in violation of § 53a-54a (a).[15] In count two of the information, the state charged the defendant with conspiracy to commit murder. In count three, the state alleged that the defendant had violated § 53-202k by using a firearm in the commission of a class A, B or C felony. In its charge to the jury at the conclusion of the trial, the court gave an instruction on § 53-202k that traced the language of that statutory provision. In addition, the court underscored that, to find a violation of § 53-202k, the jury must determine whether, "during the commission of the felony, [the defendant] use[d] or was . . . armed with any firearm . . . ." The court further instructed the jury to consider the count alleging a violation of § 53-202k only if it found that the defendant was guilty of either one or both of the first two counts.

Upon receiving a note from the jury that it had reached a verdict on the first and second counts, the trial court directed the marshal to usher the jury into the courtroom. In response to the clerk's inquiry, the foreperson announced that the jury had found the defendant not guilty of the crime of murder and guilty

---

[15] In count one, the state alleged that "the [defendant] with intent to cause the death of [the victim] did shoot with a firearm and cause the death of [the victim] . . . ."

of the crime of conspiracy to commit murder. Thereafter, the following colloquy took place regarding the third count alleging a violation of § 53-202k:

"The Clerk: As to the third count . . . does the jury find beyond a reasonable doubt that the defendant . . . has committed a class A, B or C felony? If you have found that the defendant is guilty of either count one or count two or both, your answer should be 'yes' because those are classified as such a felony. . . . [D]oes the jury find beyond a reasonable doubt that, at the time of the commission of such felony, the defendant used or was armed with a firearm, being a weapon, whether loaded or unloaded, from which a shot may be discharged?

"The [Jury] Foreperson: We did not address the third question. I'm wondering if you could just repeat it?

"The Court: A, B.

"The Foreperson: A, yes. B, yes. Or A or B, would result in 'yes' for three. Could you repeat that?

"The Clerk: I'll repeat it. . . . [D]oes the jury find, beyond a reasonable doubt, that the defendant . . . had committed a class A, B or C felony? If you have found that the defendant is guilty of one count or both counts, your answer should be 'yes' because those are classified as such a felony. . . . [D]oes the jury find—

"The Court: Let the foreperson answer. In other words, if, under our law, if he was found guilty of the second count, he has committed one of those felonies.

"[The] Foreperson: Guilty.

"The Court: Now, ask the second question.

"[The] Clerk: Yes, sir. . . . [D]oes the jury find beyond a reasonable doubt that, at the time of the commission of such felony, the defendant used or was

armed with a firearm, being a weapon, whether loaded or unloaded, from which a shot may be discharged?

"The Foreperson: Is that the same? Are there two parts . . . to the third count?

"The Court: Yes. I think you could indicate whether one or more of the persons involved in the felony, which was the felony of conspiracy to commit murder, was armed with a weapon from which a shot can [be] fired.

"The Foreperson: Okay. It doesn't have to be the defendant? It could be one or more of the conspirators?

"The Court: Yes.

"The Foreperson: Guilty.

"The Court: All right. Thank you . . . ."

The trial court accepted the jury verdict on all three counts. After sentencing the defendant to an eighteen year prison term in connection with the charge of conspiracy to commit murder, the court imposed a sentence enhancement of five years pursuant to § 53-202k.

We begin our analysis of the defendant's claim with a brief overview of § 53-202k. "Section 53-202k was enacted as part of a comprehensive legislative plan for dealing with assault weapons. . . . It provides for a mandatory five year term of imprisonment whenever a defendant, in the commission of [any class A, B or C] felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3 . . . . [T]he five year sentence runs consecutively with, and is in addition to, the sentence imposed for the underlying felony." (Citations omitted; internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 220, 751 A.2d 800 (2000). We previously have held, moreover, that § 53-202k is a sentence enhancement provision and not a separate crime. *State* v. *Dash*, supra,

242 Conn. 150. Although § 53-202k does not expressly delegate to the jury the task of determining whether a firearm was used in the commission of a felony, we have interpreted § 53-202k to require the jury to perform that fact-finding function. *State* v. *Velasco*, supra, 227. We also have concluded, however, that a flaw in the procedure pursuant to which a court enhances a defendant's sentence under § 53-202k is subject to harmless error analysis. E.g., *State* v. *Davis*, 255 Conn. 782, 793–94, 772 A.2d 559 (2001); *State* v. *Montgomery*, 254 Conn. 694, 735, 759 A.2d 995 (2000). Such an impropriety will be deemed harmless if the verdict rendered by the jury on another count of the information necessarily was predicated on factual findings that also were required for a finding of a violation of § 53-202k; see, e.g., *State* v. *Davis*, supra, 795; *State* v. *Montgomery*, supra, 737; or if the state can establish beyond a reasonable doubt that, in light of the undisputed and overwhelming evidence, the jury verdict would have been the same in the absence of the error. See *State* v. *Davis*, supra, 795–96; *State* v. *Montgomery*, supra, 738.

In view of the foreperson's representation that the jury had not expressly considered whether the defendant had violated § 53-202k, the state concedes that the procedure that the trial court followed in enhancing the defendant's sentence pursuant to § 53-202k was improper. The state nevertheless claims that the impropriety was harmless. In support of its claim, the state maintains, first, that the jury's finding of guilty on the charge of conspiracy to commit murder satisfies the requirement of § 53-202k that the defendant has committed a class A, B or C felony.[16] With respect to the second requirement of § 53-202k, namely, that the defendant "uses" a firearm during the commission of

---

[16] General Statutes § 53a-51 provides that conspiracy to commit a class A felony is a class B felony. Because murder is a class A felony; see footnote 1 of this opinion; conspiracy to commit murder is a class B felony.

that offense, the state asserts that the overwhelming and uncontested evidence established that at least one of the defendant's coconspirators used a firearm during the course of the conspiracy and, further, that a coconspirator's use of a firearm during the commission of a class A, B or C felony is attributable to any other coconspirator—in this case, the defendant—for purposes of § 53-202k.[17] We agree with the state that the jury's finding of guilty on the charge of conspiracy to commit murder satisfies the first requirement of § 53-202k and that the undisputed and overwhelming evidence established that a firearm was used during the commission of that offense.[18] We disagree with the state, however, that, for purposes of § 53-202k, the possession of a firearm by one coconspirator is attributable to other coconspirators.

We note, preliminarily, that the issue of whether § 53-202k applies to unarmed coconspirators presents a question of statutory interpretation over which our review is plenary. See, e.g., *State* v. *Peeler*, 271 Conn. 338, 433–34, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). In construing statutes, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the

---

[17] In view of the fact that the jury found the defendant not guilty on the count of the information alleging that the defendant had murdered the victim by use of a firearm; see footnote 15 of this opinion; and because the foreperson's responses to the clerk's inquiries indicated that the jury had not found that the defendant, himself, had used a firearm during the commission of the crime of conspiracy to commit murder, the state acknowledges that the record is insufficient to establish that the defendant personally had used a firearm in the course of committing the offense of conspiracy to commit murder.

[18] As we discussed previously, the object of the conspiracy was the murder of the victim. The defendant did not contest the fact, which was established by incontrovertible evidence, that the victim was murdered and that a firearm caused his fatal wounds. The defendant contended, rather, that the state had failed to prove that he had anything to do with the victim's murder.

words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter."[19] (Internal quotation marks omitted.) *State* v. *Kirk R.*, 271 Conn. 499, 510, 857 A.2d 908 (2004). "When the statute in question is one of a criminal nature, [however] we are guided by additional tenets of statutory construction. First, it is axiomatic that we must refrain from imposing criminal liability where the legislature has not expressly so intended. . . . Second, [c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Finally, unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are to be strictly construed against the state." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, supra, 434.

In support of its claim that a conspirator may be held to violate § 53-202k on the basis of his or her coconspirator's use of a firearm, the state relies on *State* v. *Davis*, supra, 255 Conn. 795–96, in which we held that an unarmed accomplice to a class A, B or C felony may be found to have violated § 53-202k on the basis of his or her accomplice's use of a firearm. According to the state, our conclusion in *Davis* that the legislature intended for § 53-202k to apply to unarmed

[19] We note that, under General Statutes § 1-2z, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Neither party contends, however, that § 1-2z governs our review of § 53-202k as it applies to the facts of this case.

accomplices should extend to unarmed coconspirators when, as in the present case, the state has established that a coconspirator used a firearm in the commission of the conspiracy. The state contends that this extension is warranted in light of the doctrine of *Pinkerton* v. *United States*, 328 U.S. 640, 646–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), under which a conspirator may be held "vicariously liable for the criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy."[20] (Internal quotation marks omitted.) *State* v. *Santiago*, 275 Conn. 192, 198, 881 A.2d 222 (2005). In the state's view, because, under the *Pinkerton* principle of vicarious liability, a conspirator may be held responsible for crimes committed by his coconspirators, he also should be held responsible, under § 53-202k, for a coconspirator's foreseeable use of a firearm in the commission of a class A, B or C felony.

The state's claim fails because the rationale underlying our determination in *Davis* regarding vicarious accomplice liability for purposes of § 53-202k does not support the state's contention regarding vicarious coconspirator liability under § 53-202k. In *Davis*, a jury found the defendant, Todd Darnell Davis, guilty of robbery in the first degree and burglary in the first degree in connection with an armed robbery of a restaurant. *State* v. *Davis*, supra, 255 Conn. 783–84. The state also alleged that Davis had violated § 53-202k. See id., 785. Although the evidence established that a firearm had been used in the commission of the robbery and burglary, the evidence was unclear as to whether it was Davis or his accomplice who actually had used the firearm during the commission of those offenses. Id., 786. The trial court nevertheless enhanced Davis' sen-

---

[20] This court has adopted the *Pinkerton* doctrine for purposes of our state criminal law. See, e.g., *State* v. *Peeler*, supra, 271 Conn. 361–63.

tence in accordance with § 53-202k, concluding that Davis had violated § 53-202k even though he was an unarmed accomplice. Id. On appeal, Davis claimed that the language and legislative history of § 53-202k demonstrated that the legislature intended that § 53-202k apply only to the individual who actually uses a firearm during the commission of a class A, B or C felony. Id., 787.

In rejecting Davis' claim, we noted, first, that this court "has long since abandoned any practical distinction between the terms 'accessory' and 'principal' for the purpose of determining criminal liability"; id., 789; and that "[t]he modern approach is to abandon completely the old common law terminology and simply provide that a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime." (Internal quotation marks omitted.) Id. We also indicated that the legislature had eliminated any legal distinction between the two terms in 1971, when it amended General Statutes § 53a-8 (a). See id., 789–90. As amended, General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct *and may be prosecuted and punished as if he were the principal offender.*"[21] (Emphasis added.) Thus, we concluded that, "[b]ecause the legislature is presumed to know the state of the law when it enacts a statute . . . we can assume that, absent an affirmative statement to the contrary, it did not intend to change the existing law to create a distinction between accessories and principals when it enacted . . . [§ 53-202k]. . . . Had the legislature intended to deviate from [the] usual

---

[21] The legislature added the language, "and may be prosecuted and punished as if he were the principal offender," to § 53a-8 (a) in 1971. Public Acts 1971, No. 871, § 2.

practice of treating accessories and principals alike, it easily could have expressed this intent. . . . In the absence of specific language to that effect, we refuse to adopt an interpretation of § 53-202k that would require courts to retreat to the days of determining which actors should be identified as principals and which should be identified as accomplices."[22] (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, supra, 255 Conn. 791.

Relying on our observation in *State* v. *Coltherst*, 263 Conn. 478, 494, 820 A.2d 1024 (2003), that "*Pinkerton* rests on the same principles as those governing accessory liability, which allow conduct to be imputed to a defendant," the state urges us to extend our holding in *Davis* to coconspirators. Specifically, the state asserts that "the legislature, presumptively mindful of the overlapping principles of accessory and conspiracy liability, would have intended to apply sentence enhancement under § 53-202k to an unarmed accused whose coconspirators to murder employed or were armed with a firearm."

We reject the state's contention primarily because, at the time § 53-202k was enacted in 1993; see Public Acts 1993, No. 93-306, § 9; the *Pinkerton* doctrine of vicarious liability was not well established in our state criminal law. Indeed, this court did not expressly adopt the *Pinkerton* doctrine for purposes of our state crimi-

---

[22] We further concluded that, "[t]he fact that § 53-202k is a sentence enhancement provision rather than a separate and distinct offense . . . is of no consequence to our analysis. The accomplice liability statute permits an accessory to be prosecuted and *punished as if he were the principal offender*. . . . Thus, once convicted of armed robbery and armed burglary, even if as an accessory, [Davis] is legally indistinguishable from the principal actor. Accordingly, [Davis] is subject to the enhancement penalty that the principal also would have received had he been caught and convicted. For purposes of legal analysis, it is irrelevant that [Davis] did not actually possess the gun." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Davis*, supra, 255 Conn. 792.

nal law until 1993; see *State* v. *Coltherst*, supra, 263 Conn. 491 (noting that "[t]his court first explicitly adopted the *Pinkerton* principle of vicarious liability . . . in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 [1993]"); the very year that § 53-202k was enacted. Thus, unlike accessorial liability, which, as a common-law and statutory rule, was firmly rooted in this state's criminal jurisprudence prior to the enactment of § 53-202k, *Pinkerton* liability was not an acknowledged part of that body of law when § 53-202k was enacted. Consequently, there is no reason to presume that the legislature contemplated that the *Pinkerton* principle of vicarious liability would apply to § 53-202k.

Moreover, although it is true that the *Pinkerton* doctrine and accessory liability both are predicated on the concept of vicarious liability, there is a significant difference between the two principles. For example, "accessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . ." *State* v. *Foster*, 202 Conn. 520, 532, 522 A.2d 277 (1987). Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense. See id. By contrast, under the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did *not* commit if the state can establish that a coconspirator *did* commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy. See, e.g., *State* v. *Peeler*, supra, 271 Conn. 370. In view of the important difference between accessory liability and *Pinkerton* liability, we reject the state's contention that we should treat them similarly for the purpose of determining whether the legislature intended to incorporate the latter into § 53-202k.

In light of the foregoing considerations, and because statutes creating criminal liability are construed strictly against the state, we agree with the defendant that his sentence enhancement under § 53-202k must be vacated.[23] Because the jury failed to find that the defendant had used a firearm during the commission of the offense of conspiracy to commit murder, the state failed to prove an element of § 53-202k and, therefore, the defendant is entitled to have his sentence enhancement under § 53-202k vacated.

### IV

The defendant next claims that the trial court improperly allowed the state to elicit testimony regarding a statement that the victim had made to Montanez, the victim's girlfriend, a few days prior to the victim's death, in which the victim had expressed his belief and apprehension that the defendant blamed him for the shooting of Johnson.[24] The defendant challenges the propriety of the trial court's evidentiary ruling on relevancy grounds. We reject the defendant's claim.

As we discussed previously, Montanez testified at trial about an incident that occurred a few days prior to the victim's death involving the defendant and several other individuals who had attempted to block the victim by parking their cars behind the victim's truck. Montanez testified that the incident had upset the victim and that he had told her, "they're trying to put this thing

---

[23] We note, moreover, that the state did not seek to prosecute the defendant under a *Pinkerton* theory of vicarious liability. Rather, the state sought to establish that the defendant *himself* had murdered the victim, a contention that the jury rejected as reflected in its verdict of not guilty on the murder charge.

[24] Although our conclusions in parts II and III of this opinion require that we reverse the judgment of the trial court, we address this claim, as well as the defendant's claim that the trial court improperly denied his request for access to documents in the possession of the state department of correction pertaining to McGahee's mental health; see part V of this opinion; because those claims raise issues that are likely to arise on retrial.

about [Johnson] on [me]." Montanez explained that the victim's use of the term "this thing" was a reference to the Johnson shooting. The defendant raised a timely objection to Montanez' testimony on the ground that the victim's statement to Montanez was irrelevant. The trial court overruled the defendant's objection, concluding that the challenged testimony, which was corroborated, was relevant to demonstrate the defendant's motive to kill the victim. On appeal, the defendant renews his contention that the trial court improperly permitted the state to adduce Montanez' testimony.

It is axiomatic that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only [when] there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 354–55, 803 A.2d 267 (2002). Furthermore, "statements expressing a declarant's present state of mind may be offered for the truth of the matter asserted, if relevant. See Conn. Code Evid. § 8-3 (4) . . . ." (Citation omitted.) *State* v. *Dehaney*, supra, 356; cf. *State* v. *Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000) (out-of-court statement not hearsay if offered to illustrate circumstantially declarant's then-existing state of mind).

"Whether the victim's state of mind is relevant depends . . . on the nature of the issues at trial. *State* v. *Crafts*, 226 Conn. 237, 253, 627 A.2d 877 (1993). We previously have held that evidence of a victim's mental

state may be relevant to establish the defendant's motive to kill the victim. See, e.g., *State* v. *Hull*, 210 Conn. 481, 501–502, 556 A.2d 154 (1989) ([t]he victim's mental state was relevant both to show the victim's fear of the defendant . . . and to establish the defendant's motive for committing the crime . . .); *State* v. *Thomas*, 205 Conn. 279, 285, 533 A.2d 553 (1987) (The trial court correctly determined that [the victim's expression of fear of the defendant] was reliable circumstantial evidence of a deteriorated relationship. As such, it was relevant and probative because it tended to support the state's claim that the relationship [between the victim and the defendant] had broken down, and from that circumstance the jury could infer motive.)." (Internal quotation marks omitted.) *State* v. *Wargo*, supra, 255 Conn. 138.

In support of his claim that the challenged testimony was irrelevant and therefore inadmissible, the defendant relies primarily on *State* v. *Duntz*, 223 Conn. 207, 613 A.2d 224 (1992), in which we held that the trial court improperly had permitted the state to introduce evidence of the victim's state of mind for the purpose of establishing motive. Id., 233. We disagree with the defendant that Montanez' testimony was inadmissible under *Duntz*.

"In [*Duntz*], the defendant, Richard Duntz, was charged with murder. See id., 209. The victim had told several people that he was frightened of Duntz, and the trial court permitted the state to call those individuals to testify about the victim's statements to show that Duntz and the victim had an antagonistic relationship and, therefore, that [Duntz] had a motive . . . to kill the victim. Id., 233. The state adduced no other evidence to indicate that an antagonistic relationship existed between the two men. See generally id., 231–33. We concluded that the trial court's evidentiary ruling constituted an abuse of discretion because the jury could not

have drawn such an inference solely from the statements of the victim without resorting to impermissible speculation [due to the fact that] the victim's expressed fear may have been subjective and unfounded. Id., 233. We also emphasized the tremendous potential for this evidence of subjective fear to prejudice [Duntz] unfairly . . . . Id." (Internal quotation marks omitted.) *State* v. *Wargo*, supra, 255 Conn. 140–41.

In the present case, in contrast to *Duntz*, the state presented independent evidence, through McGahee's testimony, that the defendant had blamed the victim for the Johnson shooting, and that the defendant had killed the victim in retaliation for that shooting. Consequently, the jury was not required to draw an inference of motive solely on the basis of the victim's uncorroborated statement. In light of McGahee's corroborative testimony, the trial court reasonably determined that Montanez' testimony regarding the victim's state of mind shortly before his death was probative of the defendant's motive to kill the victim. See, e.g., id., 141.

The defendant contends that Montanez' testimony regarding the victim's statement should have been excluded because the victim's statement was vague and ambiguous with respect to the identity of those who, in the victim's view, blamed him for shooting Johnson. It is true that the victim did not specifically identify the defendant as one of the persons who harbored the belief that the victim had shot Johnson; rather, the victim identified the passengers in the cars that were parked behind him as sharing in that belief. We nevertheless cannot conclude that the trial court abused its discretion in determining that the link between the victim's statement and the defendant was sufficient to warrant the admissibility of the victim's statement.

The defendant also maintains that the trial court improperly allowed the state to elicit the challenged

testimony in violation of the principle that, "while courts may admit evidence of direct expressions of a declarant's fear of a defendant, they generally do not permit statements as to the cause of that fear." *State v. Dehaney*, supra, 261 Conn. 359. "The state of mind hearsay exception excludes such statements because they are statement[s] of memory or belief to prove the fact remembered or believed. Conn. Code Evid. § 8-3 (4). Th[is] exclusion . . . is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." (Internal quotation marks omitted.) *State v. Dehaney*, supra, 359. In the present case, however, the victim's statement that "they're trying to put this thing about [Johnson] on [me]" was not admitted to prove the truth of the matter asserted but, rather, to prove circumstantially the victim's then-existing state of mind. Consequently, the victim's statement was not a statement of memory or belief offered to prove the fact remembered or believed. Moreover, the victim's statement did not allude to anything specific that would have caused the victim to conclude that the defendant had blamed him for the Johnson shooting. Montanez' testimony, therefore, did not violate the general proscription against the use of direct expressions regarding the cause of the declarant's fear.

The defendant finally contends that McGahee's testimony cannot be construed as independent corroboration because McGahee admitted that he had reviewed the defendant's arrest warrant and other paperwork related to the defendant's case during the period that he was incarcerated with the defendant. McGahee explained, however, that his testimony was based on the defendant's incriminating statements to him, and not on any of the documents that he had reviewed with

the defendant while they were cellmates. This claim, therefore, also lacks merit.[25] We conclude, therefore, that the trial court did not abuse its discretion in permitting the state to present Montanez' testimony regarding the victim's belief that the defendant had held him responsible for shooting Johnson.

V

Finally, the defendant argues that the trial court improperly declined to grant him access to records in the possession of the state department of correction relating to McGahee's mental health. We reject the defendant's claim because our review of the pertinent records indicates that the trial court did not abuse its discretion in declining to disclose those materials to the defendant.

Defense counsel issued a subpoena to the department of correction for McGahee's complete file. The trial court permitted the state and the defendant to inspect the file with the exception of that portion of the file containing McGahee's medical and psychiatric records. Upon examining the documents withheld from the parties, the court expressly noted that they did not indicate that McGahee had received any psychiatric treatment during the pendency of his confinement or that any recommendation had been made that McGahee should be provided with such treatment. At defense counsel's request, the original records were marked as a sealed court exhibit.

---

[25] The defendant also asserts that McGahee's testimony was not truly corroborative of the victim's statement to Montanez concerning the defendant's purported motive to kill the victim because Montanez testified that she had witnessed another individual shoot Johnson. This argument is unavailing. The existence of the defendant's purported motive to kill the victim does not depend on whether that motive was based on the defendant's accurate perception of the facts. Consequently, whether the victim actually shot Johnson was irrelevant to the trial court's determination of the admissibility of Montanez' testimony regarding the victim's statement.

We have stated that a trial court, upon inspecting such records in camera, "must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused." (Internal quotation marks omitted.) *State* v. *Peeler*, supra, 271 Conn. 380–81; see also *State* v. *Slimskey*, 257 Conn. 842, 856, 779 A.2d 723 (2001) ("[a]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records" [internal quotation marks omitted]). "[T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Internal quotation marks omitted.) *State* v. *Peeler*, supra, 381.

Our review of the sealed portion of McGahee's department of correction file confirms the trial court's conclusion that no information contained therein is pertinent to McGahee's capacity or credibility as a witness. We conclude, therefore, that the trial court properly

declined to grant the defendant access to that limited portion of McGahee's file maintained by the department of correction.[26]

The judgment is reversed and the case is remanded with direction to vacate the sentence enhancement under § 53-202k and for a new trial on the count charging the defendant with conspiracy to commit murder.

In this opinion the other justices concurred.

---

[26] The defendant also claims that certain portions of the trial court's jury instructions on reasonable doubt were constitutionally infirm. We reject these claims without extended discussion because, as the defendant acknowledges, this court previously has addressed and rejected each such claim. See, e.g., *State* v. *Colon*, supra, 272 Conn. 232–34 and n.83 (rejecting constitutional challenge to instruction that reasonable doubt is "a real doubt, an honest doubt," and kind of doubt "that in the serious affairs that concern, you would heed" [internal quotation marks omitted]); *State* v. *Lemoine*, 256 Conn. 193, 205, 770 A.2d 491 (2001) (rejecting constitutional challenge to instruction that jurors could not find defendant guilty if they could "reconcile all of the facts proven with any reasonable theory consistent with the innocence of the accused" [internal quotation marks omitted]); *State* v. *Mukhtaar*, 253 Conn. 280, 309, 311, 750 A.2d 1059 (2000) (rejecting constitutional challenge to instruction that reasonable doubt is one "for which you can give or assign a reason" [internal quotation marks omitted]). We see no reason to reconsider our prior precedent.