******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KEVIN NASH
(SC 19265)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued October 22, 2014—officially released May 5, 2015*

*Mark Rademacher*, assistant public defender, with whom, on the brief, was *Heather Wood*, former assistant public defender, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anthony J. Spinella*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. After the defendant, Kevin Nash, learned that Tyrell Knott (Tyrell) had been spreading rumors about him, the defendant retaliated by firing several shots into the second story of Tyrell's East Hartford home. One of the shots struck Tyrell's sister, Tyrikah Knott (Tyrikah), seriously injuring her. Thereafter, a jury found the defendant guilty of, inter alia, intentional assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and reckless assault in the first degree in violation of § 53a-59 (a) (3) in connection with that shooting.[1] On appeal to this court,[2] the defendant claims that (1) his convictions of intentional and reckless assault in the first degree, which were based on the same conduct, are legally inconsistent and therefore cannot stand, and (2) the evidence was insufficient to support his conviction of intentional assault in the first degree. We disagree with both claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts that the jury reasonably could have found. In or around 2005, Tyrell met Duane Brown while they were in high school together, and the two young men, both of whom are of Jamaican descent, became close friends. Brown spent a considerable amount of time at Tyrell's home, where Tyrell resided with his mother, stepfather and three sisters. At some point in the spring of 2008, Brown moved in with the defendant and the defendant's wife, and Brown and the defendant, who is also of Jamaican descent, began spending a lot of time together. Because Tyrell and the defendant did not get along well, Brown and Tyrell saw less of each other. At some point, Brown and the defendant learned that Tyrell was spreading a rumor that Brown and the defendant were in a homosexual relationship. On July 6, 2008, Brown called Tyrell and left him an angry voice mail message in which he berated Tyrell for spreading this rumor.[3]

On the evening of July 10, 2008, the defendant asked Brown to show him where Tyrell lived. The defendant, who also was angry about the rumor, told Brown that they needed to "teach [Tyrell] a lesson." Brown obliged, and the two men drove to the Knotts' house. Once there, they walked into the backyard to survey the premises. After returning home, the defendant retrieved a handgun from his bedroom and told Brown that they had to go back to the house and "shoot it up" to "give [Tyrell] a warning." Brown agreed and drove the defendant back to the house. When they arrived, Brown waited in the car while the defendant walked to the backyard and, from there, fired four or five shots into the second story of the Knotts' three story house.

At the time of the shooting, two of Tyrell's sisters, Tyrikah and S,[4] were in S's second floor bedroom. One of the bullets penetrated through the bedroom wall

and struck Tyrikah in the left buttock. Tyrikah was transported by ambulance to the hospital, where she was treated for the gunshot wound and released. After leaving the hospital, Tyrikah and her family provided the East Hartford police with information about the shooting. At that time, Tyrell told the police about the angry voice mail message that he had received from Brown a few days before the shooting.

That same day, several East Hartford police officers visited Brown at his apartment for the purpose of questioning him about his possible involvement in the shooting. After being permitted to enter the apartment, the police interviewed Brown and the defendant, who also was present at the time. Both men denied any knowledge of the shooting.[5] Brown later accompanied the police to the station to give a written statement, in which he again denied knowledge of the shooting. A few days later, however, Brown gave the police a second written statement admitting his involvement in the crime and implicating the defendant as the shooter.

Thereafter, the defendant was arrested and charged with one count each of intentional assault in the first degree in violation of § 53a-59 (a) (1), reckless assault in the first degree in violation of § 53a-59 (a) (3), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48, risk of injury to a child in violation of General Statutes (Supp. 2008) § 53-21 (a) (1), and carrying a pistol without a permit in violation of General Statutes (Rev. to 2007) § 29-35 (a), and four counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a).[6] Following a jury trial, the jury found the defendant not guilty of the conspiracy charge but guilty of all other charges. In addition, because the state sought to enhance the defendant's sentence pursuant to General Statutes § 53-202k; see footnote 6 of this opinion; the jury also found that the defendant had used a firearm in the commission of the underlying felonies. The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective sentence of sixteen years imprisonment.[7]

On appeal, the defendant claims that his convictions of both intentional and reckless assault in the first degree are legally inconsistent because they required mutually exclusive findings regarding his mental state at the time of the shooting. He further claims that the state failed to adduce evidence sufficient to support his conviction of intentional assault in the first degree because the evidence adduced at trial did not support a finding that he intended to cause serious physical injury to another person, as § 53a-59 (a) (1) requires. We disagree with both claims and, accordingly, affirm the judgment of conviction.

I

The defendant first claims that his convictions of intentional and reckless assault in the first degree cannot stand because they are legally inconsistent. In support of this claim, the defendant relies primarily on *State* v. *King*, 216 Conn. 585, 592–95, 583 A.2d 896 (1990), in which this court concluded that the convictions of the defendant, Roy Anthony King, of attempted murder and reckless assault of the same victim were legally inconsistent because the jury verdict required a finding that King simultaneously possessed mutually exclusive mental states, that is, he intended to kill the victim and he recklessly created a risk of the victim's death. According to the defendant in the present case, his convictions of intentional and reckless assault must be reversed because, like the convictions in *King*, they, too, required the jury to find that he simultaneously acted intentionally and recklessly in causing Tyrikah's injury. The state argues that this case is distinguishable from *King* because, in contrast to *King*, the charges in this case required the jury to find that the defendant acted intentionally and recklessly with respect to different results. In particular, the state argues that, because a person may intend to seriously injure a person within the meaning of § 53a-59 (a) (1) while simultaneously recklessly creating a risk of that person's death within the meaning of § 53a-59 (a) (3), the defendant's convictions are not legally inconsistent. We agree with the state.[8]

The following legal principles guide our analysis of the defendant's claim. It is well established that *factually* inconsistent verdicts are permissible. "[When] the verdict could have been the result of compromise or mistake, we will not probe into the logic or reasoning of the jury's deliberations or open the door to interminable speculation." (Internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 313, 630 A.2d 593 (1993). Thus, "claims of legal inconsistency between a conviction and an acquittal are not reviewable [on appeal]." *State* v. *Arroyo*, 292 Conn. 558, 586, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). "We employ a less limited approach, however, when we are confronted with an argument that [two convictions] are inconsistent as a matter of law or when the [convictions] are based on a legal impossibility." *State* v. *Hinton*, supra, 313. A claim of legally inconsistent convictions, also referred to as mutually exclusive convictions, arises when a conviction of one offense requires a finding that negates an essential element of another offense of which the defendant also has been convicted. *State* v. *Arroyo*, supra, 584 n.21. "In response to such a claim, we look carefully to determine whether the existence of the essential elements for one offense negates the existence of [one or more] essential elements for another offense of which the defendant also stands convicted. If that is the case, the [convictions] are legally inconsistent and cannot withstand chal-

lenge." *State* v. *Hinton*, supra, 313. Whether two convictions are mutually exclusive presents a question of law, over which our review is plenary. See *State* v. *McFarlane*, 128 Conn. App. 730, 735–36, 17 A.3d 1131, cert. denied, 301 Conn. 931, 23 A.3d 725 (2011).

Because the defendant contends that his convictions of intentional and reckless assault are mutually exclusive under *State* v. *King*, supra, 216 Conn. 585, we begin our analysis with an examination of that case. King, an inmate at the Bridgeport Community Correctional Center, was convicted of, inter alia, attempt to commit murder and reckless assault in the first degree after he set fire to a fellow inmate's cell and rigged the cell door shut to prevent him from escaping. Id., 586–88. On appeal, King claimed that his convictions of attempt to commit murder and reckless assault of the same victim based on the same conduct were legally inconsistent because they required mutually exclusive findings with respect to his mental state. See id., 592–93. We agreed with this claim, explaining that King's conviction for attempt to commit murder required the jury to find that he acted with the intent to cause the death of the victim, whereas his conviction for reckless assault required the jury to find that he acted recklessly and thereby created a risk that the victim would die. Id., 593. We further explained that "the statutory definitions of 'intentionally' and 'recklessly' are mutually exclusive and inconsistent."[9] Id., 593–94. " 'Reckless conduct is not intentional conduct because [a person] who acts recklessly does not have a conscious objective to cause a particular result.' " Id., 594, quoting *State* v. *Beccia*, 199 Conn. 1, 4, 505 A.2d 683 (1986). Thus, we observed that "[t]he intent to cause death required for a conviction of attempted murder . . . necessitated a finding that the defendant acted with the conscious objective to cause death . . . [whereas] [t]he reckless conduct necessary to be found for a conviction of assault under [§ 53a-59 (a) (3)] . . . required a finding that the defendant acted without such a conscious objective." *State* v. *King*, supra, 593. We concluded, therefore, that "the jury verdicts [with respect to attempt to commit murder and reckless assault in the first degree] each of which requires a mutually exclusive and inconsistent state of mind as an essential element for conviction cannot stand." Id., 594.

Subsequently, in *State* v. *Hinton*, supra, 227 Conn. 301, we again addressed a claim of legal inconsistency in the context of convictions for attempt to commit murder and assault in the first degree. In *Hinton*, the defendant, Ronnie Hinton, fired a shotgun into a large group of people, killing three of them and injuring a fourth victim, Jason Diaz. Id., 305. On the basis of the nonfatal injuries to Diaz the jury found Hinton guilty of attempt to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a), and three counts of assault in the first degree in violation of subdivisions

(1), (2) and (3) of § 53a-59 (a).[10] Id., 311–12. On appeal, Hinton claimed that his convictions were legally inconsistent because attempted murder and assault in the first degree under subdivisions (1) and (2) of § 53a-59 (a) required the jury to find that he acted intentionally in causing Diaz' injuries, whereas reckless assault in the first degree under § 53a-59 (3) required the jury to find that he acted recklessly in causing the same injuries.[11] Id., 312.

In addressing Hinton's claim, we noted that "two possible factual scenarios were available to the jury regarding the attempted murder and assault counts: (1) [Hinton] intended to kill or injure someone else and, in attempting to do so, injured Diaz inadvertently; or (2) [Hinton] intended to kill or injure Diaz and, in attempting to do so, injured him." Id., 314. We then concluded that Hinton's convictions were legally inconsistent under either scenario. Id., 318, 320. We explained that, if Hinton had intended to injure someone else but accidentally injured Diaz, the jury could have found Hinton guilty of intentionally assaulting Diaz under a theory of transferred intent,[12] while also finding him guilty of reckless assault for recklessly creating a risk of death as to Diaz. See id., 315. We further explained, however, that the jury could not have found Hinton guilty of attempting to murder Diaz under this scenario because Hinton would not have had the intent to kill Diaz, as required for a conviction of attempted murder, and because transferred intent does not apply to an attempt to commit a crime. See id., 316–18.

With respect to the second possible factual scenario, that is, that Hinton intended to kill Diaz but only injured him, we observed, first, that "an assault in violation of § 53a-59 (a) (1) and (2) would be consistent with an attempted murder count . . . if Diaz were [Hinton's] intended victim, because those statutory [subdivisions] require intentional conduct." Id., 318–19. We also explained, however, that the jury could not have found Hinton guilty of recklessly assaulting Diaz under this factual scenario because *King* precluded convictions of attempt to commit murder and reckless assault of the same victim when they are based on the same conduct. See id., 319. In reaching our determination, we also rejected the state's argument that Hinton's recklessness toward an unintended victim may be transferred to Diaz because the doctrine of transferred intent does not apply to recklessness. See id., 319–20. Because Hinton's convictions for attempt to commit murder and reckless assault in the first degree were inconsistent under either of the two scenarios, we concluded that he was entitled to a new trial. Id., 320–21.

The decisions in *King* and *Hinton* were predicated on two general principles applicable to all claims of legally inconsistent verdicts. First, as is evident from our discussion of the alternative factual scenarios in

*Hinton*, courts reviewing a claim of legal inconsistency must closely examine the record to determine whether there is any plausible theory under which the jury reasonably could have found the defendant guilty of both offenses. See id., 314; see also *State* v. *Morascini*, 62 Conn. App. 758, 761–62, 772 A.2d 703, cert. denied, 256 Conn. 921, 774 A.2d 141 (2001). This principle guided our analysis in *State* v. *Williams*, 237 Conn. 748, 679 A.2d 920 (1996), in which the defendant, Gregory Williams, claimed that his convictions of attempt to commit murder, which requires the intent to kill, and intentional assault in the first degree, which requires the intent to cause serious physical injury, were legally inconsistent because a person cannot simultaneously intend to cause both results to the same victim. See id., 754–55. In rejecting this claim, we undertook a thorough examination of the facts to ascertain whether the jury reasonably could have found that Williams simultaneously possessed both mental states with respect to the same victim. Id., 750–51, 757. We concluded that, on the basis of Williams' actions of "repeatedly [striking] the victim over the head with a baseball bat until the bat broke . . . [t]he jury reasonably could have inferred . . . that [Williams] had possessed, at the same time and by the same acts, the intent to cause the victim's death and the intent to cause the victim serious physical injury while he was attempting to kill her." Id., 757. Because there was a plausible theory under which the jury could have found Williams guilty of both crimes—namely, by finding that he intended to cause the victim serious physical injury while attempting to kill her—we concluded that Williams' convictions were not legally inconsistent.[13]

The second principle that we recognized in *King* and *Hinton* is that, in determining whether two mental states are mutually exclusive, the court must consider each mental state as it relates to the particular result described by the statute. In *King*, for example, the convictions of attempt to commit murder and reckless assault necessarily reflected a finding by the jury that King acted both intentionally and recklessly with respect to the victim's death. We explained that those convictions were mutually exclusive because they were predicated on findings that King both intended to cause the victim's death and that he did not intend to cause the victim's death. See *State* v. *King*, supra, 216 Conn. 593–94. In *Hinton*, however, we reaffirmed our holding in *King* but also explained that a defendant could simultaneously act intentionally and recklessly with respect to *different* results. See *State* v. *Hinton*, supra, 227 Conn. 315. We observed, for example, that, when Hinton fired into the group of people, he could have intended to kill or injure one member of the group while recklessly creating a risk of death with respect to the other members, and that, in such circumstances, the jury reasonably could have found him guilty of the attempted

murder of one victim and reckless assault of another victim because the mental states required for each conviction would have related to different results. See id. ("[a]lthough we said in [*King*] that a person could not act intentionally and recklessly with regard to the same act and the same result, here we have two different victims *and therefore two different results*" [emphasis added]). Thus, *Hinton* makes clear that a person can simultaneously act intentionally and recklessly with respect to the same criminal conduct as long as each mental state relates to a different result.[14] Moreover, there is no reason why a person cannot simultaneously act intentionally and recklessly with respect to the same conduct *and* the same victim if each of those two mental states pertains to a different result.[15]

Applying the foregoing principles to the present case, we conclude that the defendant's convictions for intentional and reckless assault in the first degree are not legally inconsistent because the two mental states required to commit the offenses relate to different results. More specifically, in order to find the defendant guilty of those offenses, the jury was required to find that the defendant intended to injure another person and that, in doing so, he recklessly created a risk of that person's death.[16] In light of the state's theory of the case, there was nothing to preclude a finding that the defendant possessed both of these mental states with respect to the same victim at the same time by virtue of the same act or acts.[17] In other words, the jury could have found that the defendant intended only to injure another person when he shot into S's bedroom but that, in doing so, he recklessly created a risk of that person's death in light of the circumstances surrounding his firing of the gun into the dwelling. Accordingly, because the jury reasonably could have found that the defendant simultaneously possessed both mental states required to convict him of both intentional and reckless assault, he cannot prevail on his claim that the convictions were legally inconsistent.

In support of his claim to the contrary, the defendant argues that the mental states required to commit each of the offenses *did* relate to the same result, namely, serious physical injury to the victim. He contends that two convictions are mutually exclusive if they require the jury to find that a defendant simultaneously acted intentionally and recklessly and, in doing so, caused the same result to the victim. This argument reflects a fundamental misunderstanding of the nature of legally inconsistent verdicts. "[M]ental states . . . exist only with reference to particular results or circumstances. Thus, it is necessary to examine the mental state element as it arises in each particular statute defining an offense to determine whether actual inconsistency exists." (Internal quotation marks omitted.) *State* v. *Flynn*, 14 Conn. App. 10, 27, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988).

The relevant inquiry in determining whether two convictions are mutually exclusive is whether the opposing mental states relate to the same result, not whether both convictions relate to the same injury.

This principle is demonstrated by a comparison of the elements of the two statutes at issue in this case. Intentional assault in the first degree in violation of § 53a-59 (a) (1) requires proof that the defendant (i) had the intent to cause serious physical injury to a person, (ii) caused serious physical injury to such person or to a third person, and (iii) caused such injury with a deadly weapon or dangerous instrument. Reckless assault in the first degree in violation of § 53a-59 (a) (3) requires proof that the defendant (i) acted under circumstances evincing an extreme indifference to human life, (ii) recklessly engaged in conduct that created a risk of death to another person, and (iii) caused serious physical injury to another person. As we previously explained, the mental state elements in the two provisions—"intent to cause serious physical injury" and "recklessly engag[ing] in conduct which creates a risk of death"—do not relate to the same result. Moreover, under both provisions, the resulting serious physical injury is an element of the offenses that is separate and distinct from the mens rea requirements.[18] Because the defendant's convictions for intentional and reckless assault in the first degree required the jury to find that the defendant acted intentionally and recklessly with respect to different results, the defendant cannot prevail on his claim that those convictions are mutually exclusive and, therefore, legally inconsistent.[19]

## II

We next consider the defendant's contention that the evidence did not support a finding that he acted with the "intent to cause serious physical injury to another person," as required under § 53a-59 (a) (1). We reject the defendant's claim.[20]

The following additional facts are relevant to our resolution of this claim. Viewing the Knotts' house from the backyard, there are three bedroom windows on the second floor. Tyrikah occupied the bedroom on the far left, S occupied the bedroom on the far right, and K, their youngest sister, occupied the middle bedroom. Testimony indicated that, prior to the shooting, Tyrikah and S had been in their respective bedrooms with the lights on, that K was asleep in her room, and that Tyrikah had left the light on in her bedroom when she went to S's room. According to Brown, when he and the defendant were outside the house earlier in the evening, there were no lights on in the second floor bedrooms. The evidence also established that the defendant shot only toward the bedrooms that appeared to be occupied—that is, the two bedrooms with lights on—which is where all of the bullet holes were found. Brown further testified that the defendant had told him that

he shot into the window on the far right because the light was on and he thought he saw a curtain move. When Tyrikah was shot, she was standing with her back against S's dresser, which is directly in front of that window. Finally, the bullet that struck Tyrikah penetrated the wall and passed through the dresser just below the window, and a second bullet entered S's room immediately to the left of the window.

We begin our analysis by setting forth the legal principles governing our review of the defendant's claim. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Taylor*, 306 Conn. 426, 432, 50 A.3d 862 (2012).

The defendant challenges the sufficiency of the evidence only with regard to the intent element of § 53a-59 (a) (1). "A person acts 'intentionally' with respect to a result . . . described by a statute defining an offense when his conscious objective is to cause such result . . . ." General Statutes § 53a-3 (11). As we frequently have observed, "[i]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted.) *State* v. *Tomasko*, 238 Conn. 253, 257, 681 A.2d 922 (1996); see also *State* v. *Rodriguez*, 180 Conn. 382, 404, 429 A.2d 919 (1980) ("The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proved by circumstantial evidence . . . and is, except in rare cases, a question of fact." [Citation omitted.]).

We agree with the state that the evidence was suffi-

cient to support a finding that the defendant intended to cause serious physical injury to another person when he shot into S's room. Brown testified that the defendant told him after the shooting that he had shot into the window on the far right because the lights were on and because he thought he saw a curtain move. A fair inference may be drawn from this statement that, because of the light and movement, the defendant thought that a person was in front of or near S's window, and that he intended to shoot that person when he fired in the direction of the window. The location of the bullet holes and Tyrikah's location at the time of the shooting support this interpretation of the defendant's statement. The evidence also established that there was a dresser in front of S's window and that Tyrikah was standing directly in front of the dresser when she was shot. The bullet that struck Tyrikah entered the room directly below the window, and a second bullet entered just to the left of the window. The fact that Tyrikah was directly in front of the window corroborates Brown's testimony that the defendant told him that he saw movement near the window just before the shooting and further supports the finding that the defendant intended to shoot whomever was near that window. On the basis of this evidence, the jury reasonably could have found that the defendant intended to cause serious physical injury to another person.[21] Cf. *State* v. *Wells*, 100 Conn. App. 337, 345–46, 917 A.2d 1008 (evidence that defendant believed that person was behind door through which he fired shotgun supported finding that he intended to cause serious physical injury), cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007).

We find no merit in the defendant's contention that a person cannot have the intent to cause serious physical injury to another person under § 53a-59 (a) (1) unless he is "substantially certain" that he is aiming at a visible, identifiable person. This argument conflates two separate and distinct concepts under our Penal Code, namely, intent and knowledge. We previously have stated that "[a]n 'intent' element is not synonymous with a 'knowledge' element, each of which is specifically defined in the [P]enal [C]ode." *State* v. *Denby*, 235 Conn. 477, 482, 668 A.2d 682 (1995). Under our Penal Code, "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or engage in such conduct"; General Statutes § 53a-3 (11); whereas "[a] person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ." General Statutes § 53a-11 (12). In other words, a specific intent element requires proof that the defendant's objective or purpose was to achieve a particular result, whereas a knowledge element requires proof that the defendant was aware of a particular fact or cir-

cumstance.

Because a person's intent reflects his subjective purpose in carrying out his actions, that person may intend to accomplish a particular result without necessarily knowing that physical realities will make it possible for him to do so. See, e.g., 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 5.2 (b), pp. 343–44 (noting that person may act with intent to cause particular result without necessarily knowing that his conduct will cause intended result). Thus, a jury could find that a defendant who committed a drive-by shooting had the intent to kill a person inside the targeted dwelling, even if the defendant was unsure where inside the dwelling the intended victim was located, or even if that person was not present in the dwelling. See *Puckett* v. *Costello*, 111 Fed. Appx. 379, 383–84 (6th Cir. 2004) (evidence supported finding that defendant who aided in drive-by shooting had intent to kill when defendant told gunman to shoot at specific apartment in which he knew rival gang members lived, even though evidence did not establish whether defendant knew that apartment was occupied at that time), cert. denied, 543 U.S. 1160, 125 S. Ct. 1320, 161 L. Ed. 2d 131 (2005); *People* v. *Migliore*, 170 Ill. App. 3d 581, 585–86, 588, 525 N.E.2d 182 (evidence was sufficient to support finding of intent to kill when defendant fired at door behind which he believed intended victim might be standing), appeal denied, 122 Ill. 2d 569, 530 N.E.2d 257 (1988). A jury also could find that a defendant who set fire to a home intended to kill the inhabitants of the home even if he was not certain that they were present at the time. See *People* v. *Adams*, 169 Cal. App. 4th 1009, 1022–23, 86 Cal. Rptr. 3d 915 (2008) (defendant who set fire to home for purpose of killing particular person or persons may be found to have had intent to kill all inhabitants even if he did not know whether they were present at that time), review denied, California Supreme Court, Docket No. S170399 (Cal. April 1, 2009); cf. *Commonwealth* v. *Waters*, 27 Mass. App. 64, 67–69, 534 N.E.2d 802 (evidence was sufficient to support finding that defendant intended to kill all inhabitants of home by throwing Molotov cocktails at house when inhabitants were likely to be asleep), review denied, 404 Mass. 1104, 537 N.E.2d 1248 (1989). To prove that the defendant was guilty of intentional assault, therefore, the state was not required to establish that the defendant knew with certitude that he was shooting at a person but only that he believed his intended target was a person when he fired his weapon. The jury reasonably could have found that the defendant intended to cause serious physical injury even if he was not substantially certain that he was aiming at a specific person.

The defendant's argument that the evidence supported a finding that he acted only recklessly, rather than intentionally, is similarly unavailing. In support of this contention, the defendant maintains that the

evidence demonstrates that his shots were entirely random because all of the bullets entered through the back wall of the house rather than through the windows. He further relies on the testimony of Brown, who was with the defendant on the night of the shooting, that Brown himself believed that the defendant discharged his weapon at the house solely to send a message to Tyrell and not to actually injure someone. For the reasons that we previously discussed, however, the jury reasonably could have found that the defendant's shots were not random but that the defendant targeted only the bedrooms that appeared to be occupied, and that he specifically targeted S's bedroom because he believed that a person was near the window. The fact that the defendant's shots did not enter through the windows does not compel a finding that the defendant did not intend to injure anyone. Indeed, the fact that both of the shots that the defendant fired into S's room penetrated the wall in the area immediately surrounding the window suggests that he was trying to shoot the person he believed was nearby, rather than firing randomly solely to frighten Tyrell or the occupants of the house. As the state argues, if the gunfire had been entirely random, the bullet holes likely would have been scattered throughout the house rather than concentrated in the only two bedrooms that appeared to be occupied at the time of the shooting.

We recognize, of course, that the jury reasonably could have credited the defendant's argument that he did not intend to physically injure anyone but that he only did so recklessly. The fact that the jury could have elected to believe the defendant's alternative explanation of the evidence, however, does not mean that the jury was required to accept that explanation. As we often have observed, when reviewing a claim of evidentiary insufficiency, "we give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable therefrom that support the jury's determination of guilt." *State* v. *Sivri*, 231 Conn. 115, 134, 646 A.2d 169 (1994); see also id., 134–36 (court would not second-guess jury's rejection of defendant's theory that he had acted recklessly when reasonable view of evidence supported jury's finding that defendant acted with intent to kill). When considered in the light most favorable to the state, the evidence supported the jury's finding that the defendant intended to cause serious physical injury to another person, and we therefore will not disturb that determination on appeal.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or dangerous instrument . . . or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another

person, and thereby causes serious physical injury to another person . . . ."

[2] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Testimony indicated that, in Jamaica, many consider it a serious affront to accuse a man of being homosexual.

[4] In accordance with our policy of protecting the privacy interests of victims of the crime of risk of injury to a child, we decline to identify any child victim in this case or others through whom the victim's identity may be ascertained.

[5] Because the defendant was in his underwear when the police arrived, one of the officers handed him a pair of pants that were lying on the floor of his bedroom. Police found a pair of black gloves in one of the pant pockets, and those gloves subsequently tested positive for gunshot residue. When questioned by the police, the defendant acknowledged that he had worn those same pants the previous day.

[6] The state also sought to enhance the defendant's sentence and charged him with three counts of commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k.

General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

As this court previously has explained, § 53-202k is a sentence enhancement provision and not a separate crime. E.g., *State* v. *Patterson*, 276 Conn. 452, 476, 886 A.2d 777 (2005). We have interpreted § 53-202k to require that the jury, rather than the court, determine whether a firearm was used in the commission of the underlying felony. Id., 477.

[7] The trial court merged the two assault convictions for purposes of sentencing and subsequently imposed a sentence only for intentional assault in the first degree. In *State* v. *Polanco*, 308 Conn. 242, 255, 61 A.3d 1084 (2013), we concluded that, when a defendant is convicted of both a greater and lesser included offense, the appropriate remedy is to vacate the conviction for the lesser offense rather than to merge the convictions. Although stating that we saw "no reason why our holding, of logical necessity, would not apply with equal force to other scenarios in which cumulative convictions violate the double jeopardy clause"; id., 249 n.3; we ultimately reserved judgment on that issue. Because the defendant in the present case does not claim that the approach that we employed in *Polanco* applies to his convictions of intentional and reckless assault in the first degree, we do not address that issue in this appeal.

[8] Because the defendant did not raise this claim in the trial court, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which governs our consideration of unpreserved constitutional claims. Although, as the state concedes, the defendant is entitled to review of his unpreserved claim under *Golding*, he cannot prevail on the claim because, contrary to his contention, his convictions of intentional and reckless assault are not legally inconsistent.

[9] General Statutes § 53a-3 provides in relevant part: "(11) A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct;

* * *

"(13) A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

[10] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (2) with intent to disfigure another person seriously or permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person . . . ."

For the text of subdivisions (1) and (3) of § 53a-59 (a), see footnote 1 of this opinion.

[11] As we explained in *Hinton*, "§ 53a-59 (a) specifies three separate and exclusive definitions of assault in the first degree. . . . The state charged [Hinton] with committing assault in the first degree against Diaz under subdivision (1), subdivision (2) and subdivision (3) of [§ 53a-59 (a)]. The trial court instructed the jury to consider each of these three subdivisions and its lesser included offenses. The court did not instruct the jury that the three subdivisions were alternative methods of committing the same crime, and that it could [find Hinton guilty] under only one subdivision. The jury returned separate guilty verdicts under each of the three subdivisions charged by the state. The trial court accepted all three verdicts." (Citation omitted.) *State* v. *Hinton*, supra, 227 Conn. 312 n.14. The court imposed only one sentence on the first degree assault convictions, however, and Hinton raised no double jeopardy claim. Id., 314 n.16.

[12] "[T]he principle of transferred intent was created to apply to the situation of an accused who intended to kill [or injure] a certain person and by mistake killed [or injured] another. His intent is transposed from the person to whom it was directed to the person actually killed [or injured]." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 51, 826 A.2d 1126 (2003); see also *State* v. *Hinton*, supra 227 Conn. 306 n.8.

[13] In accordance with this principle, the Appellate Court has upheld convictions involving allegedly inconsistent mental states when the jury reasonably could have found that a defendant's single course of conduct actually "constituted different crimes that occurred on an escalating continuum." (Internal quotation marks omitted.) *State* v. *Jones*, 68 Conn. App. 562, 569, 792 A.2d 148, cert. denied, 260 Conn. 917, 797 A.2d 515 (2002); see also *State* v. *Bjorklund*, 79 Conn. App. 535, 567–68, 830 A.2d 1141 (2003), cert. denied, 268 Conn. 920, 846 A.2d 882 (2004); *State* v. *Mooney*, 61 Conn. App. 713, 720–22, 767 A.2d 770, cert. denied, 256 Conn. 905, 772 A.2d 598 (2001). In these cases, the Appellate Court concluded that the jury, in determining guilt, was not required to find that the defendant simultaneously possessed the conflicting mental states in order to find him guilty of the two offenses. For example, in *Jones*, the Appellate Court held that the jury reasonably could have found that the defendant, who had fired two rounds of gunfire into the victim's front windshield, recklessly created a risk of serious physical injury to the victim during the first round of shots and intended to cause the victim serious physical injury during the second round of shots. See *State* v. *Jones*, supra, 569–70.

[14] This principle is also reflected in several Appellate Court decisions in which that court concluded that a defendant could simultaneously act intentionally and recklessly with respect to different results. See, e.g., *State* v. *Morascini*, supra, 62 Conn. App. 762–63 (convictions of public indecency in violation of General Statutes [Rev. to 2001] § 53a-186 [a] [2], which required finding of "intent to arouse or to satisfy the sexual desire of the person," and of breach of peace in violation of General Statutes § 53a-181 [a] [5], which required finding that, inter alia, defendant "recklessly creat[ed] a risk [of causing inconvenience, annoyance, or alarm]," not legally inconsistent because jury could have found that defendant had intent to arouse or to satisfy his own sexual desire while simultaneously recklessly creating risk of inconvenience, annoyance or alarm to another); *State* v. *Flynn*, 14 Conn. App. 10, 27, 539 A.2d 1005 (convictions of assault of peace officer in violation of General Statutes [Rev. to 1983] § 53a-167c [a], which requires "intent to prevent a . . . peace officer . . . from performing his duty," and of reckless endangerment in violation of General Statutes § 53a-64 [a], which requires "recklessly engag[ing] in conduct which creates a risk of physical injury," not legally inconsistent because mental states related to different results), cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988). Although these cases involve factual scenarios in which the defendant acted intentionally and recklessly toward different individuals, there is no reason why a defendant may not simultaneously possess two different mental states with respect to a single victim, as long as each mental state relates to a different result.

[15] For example, if A shoots B in the arm intending only to injure B, A nevertheless may recklessly expose B to a risk of death if A's conduct also gave rise to an unreasonable risk that the bullet would strike B in the chest and thereby kill him. In such circumstances, a jury could find both that A intended to injure B and, in doing so, recklessly created an undue risk of B's death.

[16] Other courts that have considered this issue have concluded that convictions are not legally inconsistent under the facts presented even though they required a finding that the defendant simultaneously intended to injure

a person and recklessly created a risk of the same person's death. See, e.g., *People* v. *Noble*, 635 P.2d 203, 211–13 (Colo. 1981); *Commonwealth* v. *Walker*, 442 Mass. 185, 203–204, 812 N.E.2d 262 (2004); *People* v. *Trappier*, 87 N.Y.2d 55, 58–59, 660 N.E.2d 1131, 637 N.Y.S.2d 352 (1995); *People* v. *Pitterson*, 45 App. Div. 3d 308, 309, 845 N.Y.S.2d 255 (2007), appeal denied, 10 N.Y.3d 770, 883 N.E.2d 1266, 854 N.Y.S.2d 331 (2008).

[17] Although the defendant does not rely on it, the state draws our attention to *Griffin* v. *Parker*, 219 Conn. 363, 593 A.2d 124 (1991), a civil case in which we endorsed the position advanced by the defendant, namely, that convictions for intentional and reckless assault in the first degree are inconsistent as a matter of law. See id., 370. In *Griffin*, the plaintiff, Theodore E. Griffin, brought a civil action against the defendant, Claude L. Parker, seeking to recover for injuries he sustained when Parker shot him. See id., 366. Based on the allegations in his complaint, Griffin was required to prove that Parker intentionally assaulted him. See id., 366–68. Parker previously had been convicted of assaulting Griffin in connection with the shooting. See id., 370. In the civil case, the trial court granted Griffin's motion for summary judgment on the basis of its determination that Parker was precluded from relitigating the issue of whether he intentionally had assaulted Griffin because the criminal jury had found Parker guilty of both intentional and reckless assault. Id., 367. In reversing the trial court's judgment, we concluded that Parker's convictions for intentional and reckless assault were legally inconsistent because they required the jury to find that Parker "simultaneously acted intentionally and recklessly with regard to the same act *and the same result*, namely, the firing of the shotgun and the *consequent serious physical injury* to [Griffin]." (Emphasis added.) Id., 370. We concluded, therefore, that, because the jury could not properly have found Parker guilty of both intentional and reckless assault, and because there was no way "of determining from the record which state of mind the jury found that [Parker] possessed when he shot [Griffin]"; id., 371; Parker was not precluded from relitigating the issue of whether the shooting was intentional. See id. To the extent that our statement in *Griffin* suggests that the jury could not have found Parker guilty of both intentional and reckless assault because the two crimes require proof that a defendant simultaneously acted intentionally and recklessly with respect to the same result, we disavow any such suggestion because, as we have explained, the state's evidence may establish that the defendant acted intentionally and recklessly with regard to a different result.

[18] We recognize that there is language in *King* and *Williams* that, if read in isolation, may be interpreted as supporting the defendant's position. See *State* v. *Williams*, supra, 237 Conn. 756 ("[t]he holding in *King* was premised on the conclusion that, because *a defendant cannot act recklessly and intentionally at the same time toward the same victim*, a guilty verdict based on a finding that a defendant acted with recklessness is inconsistent with a guilty verdict based on a finding that the defendant acted intentionally" [emphasis added]); *State* v. *King*, supra, 216 Conn. 593 ("[t]o return verdicts of guilty for both attempted murder and [reckless] assault in the first degree, therefore, the jury would have had to find that the defendant simultaneously acted intentionally and recklessly with regard to the same act and the same result, *i.e.*, *the injury to the victim*" [emphasis added]). Although these statements, when considered out of context, could be construed as a mischaracterization of the relevant inquiry for determining the existence of mutually exclusive verdicts, our analysis in those cases correctly focused on whether the convictions required mutually exclusive findings regarding the defendant's mental state with respect to the same result. Nothing that we said in *King* or *Williams* should be read to mean that a person cannot act intentionally and recklessly toward the same person, or that the relevant inquiry is whether the statutes at issue require findings that the defendant caused the same injury to the victim. Rather, as we have explained, when two convictions require a finding that the defendant simultaneously acted intentionally and recklessly, they are legally inconsistent only if they require that the defendant possess the opposing mental states with respect to the same objective, as identified by the relevant statutes.

[19] We emphasize that our conclusion that the defendant's convictions of intentional and reckless assault in the first degree were not mutually exclusive does not mean that a defendant lawfully may be punished for both offenses. As we previously discussed; see footnote 7 of this opinion; the trial court in the present case merged the two assault convictions for purposes of sentencing and sentenced the defendant only on his intentional assault conviction. The defendant has not claimed that this approach violates his

right against double jeopardy.

[20] We note that, although the trial court instructed the jury in accordance with § 53a-59 (a) (1) that the state was required to prove that the defendant intended to cause serious physical injury "to another person," who, in fact, was Tyrikah, on one occasion, the court indicated that the state was required to prove that the defendant caused serious physical injury to Tyrikah while intending to cause such injury to *Tyrell*. Contrary to the court's latter instruction, the state was required to demonstrate only that the defendant intended to cause serious physical injury to another person and caused such injury to that person or another person; the state was not required to establish that the defendant intended to cause serious physical injury to Tyrell in particular. Moreover, the defendant's argument that the evidence was insufficient to support his conviction under § 53a-59 (a) (1) is not predicated on the claim that the state failed to prove that the defendant intended to cause serious physical injury to Tyrell specifically.

[21] At oral argument, the defendant's appellate counsel noted that photographs of the crime scene show that a mirror above the dresser in S's bedroom obscured a large portion of the window and argued that this shows that the defendant could not have been certain that he was aiming at a person inside the bedroom. As counsel conceded, however, the mirror did not block the entire window, and enough of the window was left unobstructed that the defendant clearly could have seen someone moving inside the bedroom.

—————————————————————