******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KENNETH JAMISON
(SC 19409)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued October 15, 2015—officially released March 15, 2016*

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Richard L. Palombo, Jr.*, senior assistant state's attorney, for the appellant (state).

*John L. Cordani, Jr.*, assigned counsel, for the appellee (defendant).

*Opinion*

PALMER, J. The state appeals, following our grant of certification, from the judgment of the Appellate Court, which reversed in part the judgment of the trial court convicting the defendant, Kenneth Jamison, following a jury trial, of, inter alia, illegal possession of an explosive in violation of General Statutes § 29-348, and manufacturing a bomb in violation of General Statutes § 53-80a.[1] See *State* v. *Jamison*, 152 Conn. App. 753, 755, 780, 99 A.3d 1273 (2014). The state claims that the Appellate Court incorrectly concluded that, although the defendant did not request an accomplice credibility instruction, the trial court committed plain error by not providing one, sua sponte, to the jury. The defendant disputes the state's contention and also argues that, even if we agree with the state's claim, the Appellate Court's judgment can be affirmed on the alternative ground that the trial court had violated his rights under the Connecticut constitution by compelling him to provide a handwriting exemplar. We agree with the state that the trial court's failure to give an accomplice credibility instruction did not constitute plain error, and we also reject the defendant's alternative ground for affirmance. Accordingly, we reverse in part the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts, which the jury reasonably could have found, and procedural history. In 1995, "Maria Caban lived in a third floor apartment [at 400 Wood Avenue] in [the city of] Bridgeport. The defendant, her boyfriend at the time, would stay with her on occasion. On October 12, 1995, at approximately 8:40 p.m., eight police officers executed a search warrant [for] the apartment, which had front and rear entrances. One group of officers entered the rear of the apartment using a battering ram while the second group entered through the front. The group entering from the front encountered the defendant, dressed only in boxer shorts, on the stairs leading up to the apartment. The defendant was brought up into the apartment and read his *Miranda*[2] rights. . . .

"The police searched the premises and found a pair of sneakers that contained a straw and [a] folded dollar bill. Inside of the bill was a white powdery substance that later was revealed through testing to be cocaine. When questioned, the defendant admitted that the sneakers belonged to him. The search also produced an M-1000 explosive device [M-1000] with pennies glued to its exterior,[3] a loaded firearm, an additional small amount of cocaine,[4] a weighing scale, an electric heat sealer for sealing plastic bags, and a notebook with references to drug trafficking. The police also discovered a safe containing business documents signed by the defendant. [Subsequently, Caban turned over to the police handwritten letters that the defendant had writ-

ten to her during their relationship.]

"The defendant was arrested and charged with two counts of possession of narcotics with [the] intent to sell, manufacturing a bomb, [illegal] possession of an explosive, and criminal possession of a firearm. Prior to trial, the defendant was ordered by the court to submit a handwriting exemplar for comparison with [writing in] the notebook found in the apartment. In October, 1996, the defendant was tried before a jury. [At trial, Caban testified that, although she was the one who had purchased the M-1000, she and the defendant both had glued the pennies to its exterior after watching a television program about 'how . . . [to] make explosives out of things in your house and fireworks.' Caban further testified that she had testified as a state's witness in other criminal cases.] After the state [concluded its case-in-chief], the [defense] moved for a judgment of acquittal on all charges. The court granted the motion with respect to the two counts of possession of narcotics with [the] intent to sell and directed the state to file an amended information charging the defendant with [illegal] possession of [a narcotic substance]. The court denied the motion as to all other charges.

"The jury found the defendant guilty of [illegal] possession of [a narcotic substance], manufacturing a bomb, and [illegal] possession of an explosive . . . [but not guilty] on the charge of criminal possession of a firearm. The court sentenced the defendant to a total effective term of thirty-seven years of incarceration, execution suspended after thirty-two years, [and] five years of probation." (Footnotes altered.) *State* v. *Jamison*, supra, 152 Conn. App. 756–57.

The defendant appealed to the Appellate Court, claiming, inter alia, that, although the defense did not request an accomplice credibility instruction regarding Caban's testimony, it was plain error for the trial court not to have provided one, sua sponte, to the jury. Id., 755, 760. The Appellate Court agreed, concluding, first, that, because Caban had testified that she purchased the M-1000 and helped the defendant attach pennies to it, the trial court's failure to provide an accomplice credibility instruction was "a patent and readily discernible error"; id., 762; in light of decades of case law mandating that such an instruction be given when, as in the present case, a person who aided in the commission of the offense with which the accused is charged testifies against the accused at trial. Id., 766 n.5.

The Appellate Court further concluded that the trial court's error was sufficiently harmful as to require reversal of the defendant's conviction of manufacturing a bomb and the illegal possession of an explosive. See id., 765–66. In reaching its determination, the Appellate Court considered the several factors first identified by this court in *State* v. *Ruth*, 181 Conn. 187, 199–200, 435 A.2d 3 (1980)—a case involving a *preserved* claim of

instructional error—for determining whether the harm caused by the omission of an accomplice credibility instruction warranted a new trial. See *State* v. *Jamison,* supra, 152 Conn. App. 763–64. According to the Appellate Court, those considerations favored the defendant because Caban's testimony was the only evidence linking the defendant to the explosive device, Caban provided inconsistent testimony regarding the gun found in her apartment, and the trial court did not instruct the jury to consider Caban's potential bias in assessing her credibility. Id.

We granted the state's petition for certification to appeal, limited to the following question: "Did the Appellate Court properly reverse the defendant's convictions under the plain error doctrine where the trial court failed to give an accomplice credibility instruction?" *State* v. *Jamison,* 314 Conn. 943, 102 A.3d 1117 (2014). Because we answer the certified question in the negative, we must consider the defendant's alternative ground for affirmance, namely, that the trial court violated his rights under the Connecticut constitution when it required him to provide a handwriting exemplar. We need not address the merits of that claim, however, because we conclude that the use of the compelled handwriting exemplar at the defendant's trial was harmless.

I

We begin our analysis of the state's claim by setting forth the legal principles that govern our review of the claim. It is well established that the plain error doctrine, codified at Practice Book § 60-5, "is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party.[5] [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the

face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; emphasis in original; footnote added; internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–78, 60 A.3d 271 (2013); see also *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009) ("[I]t is not enough for the [party seeking plain error review] simply to demonstrate that his position is correct. Rather, [he] . . . must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . . [U]nder the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust." [Citations omitted.]). Finally, our review of the Appellate Court's conclusion with respect to plain error is plenary. See, e.g., *State* v. *Sanchez*, supra, 80.

With regard to individualized credibility instructions, we consistently have held that "a defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. . . . An exception to this rule, however, involves the credibility of accomplice witnesses. . . . [When] it is warranted by the evidence, it is the court's duty to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if [he or she] assisted or aided or abetted in the commission, of the offense with which the defendant is charged. . . . [I]n order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose. . . . With respect to the credibility of accomplices, we have observed that the inherent unreliability of accomplice testimony ordinarily requires a particular caution to the jury . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 823–24, 981 A.2d 1030 (2009), cert. denied,

560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010); see also *State* v. *Diaz*, 302 Conn. 93, 115–16, 25 A.3d 594 (2011) ("the rationale underlying the requirement of a special credibility instruction in cases involving accomplice or complainant testimony . . . [is] that the accomplice or complaining witness has a powerful motive to falsify his or her testimony" [internal quotation marks omitted]); *State* v. *Stebbins*, 29 Conn. 463, 473 (1861) (court's failure to caution jury regarding accomplice testimony was "a clear omission of judicial duty"). The trial court's duty to caution the jury "is implicated only [when] the trial court has before it sufficient evidence to make a determination that there is evidence that [a] witness was in fact an accomplice." (Internal quotation marks omitted.) *State* v. *Gentile*, 75 Conn. App. 839, 855, 818 A.2d 88, cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003). With these principles in mind, we turn to the state's claim.

With respect to the first prong of the plain error test, we agree with the defendant that the trial court's failure to give an accomplice credibility instruction was an obvious and readily discernible error.[6] As we have explained, however, the defendant also must demonstrate, under the second prong of the plain error test, that the omission was so harmful or prejudicial that it resulted in manifest injustice. *State* v. *Sanchez*, supra, 308 Conn. 77, 78. This stringent standard will be met only upon a showing that, as a result of the obvious impropriety, the defendant has suffered harm so grievous that fundamental fairness requires a new trial.

In *State* v. *Ruth*, supra, 181 Conn. 187, this court first identified the following four factors that an appellate court should consider when evaluating whether the trial court's decision not to give an accomplice credibility instruction deprived the defendant of a fair trial: "whether (1) the accomplice testimony was corroborated by substantial independent evidence of guilt, (2) the accomplice testimony was consistent, (3) the accomplices' potential motives for falsifying their testimony were brought to the jury's attention, and (4) the court's instructions to the jury suggested that the witnesses might have an interest in coloring their testimony." *State* v. *Moore*, supra, 293 Conn. 825; see *State* v. *Ruth*, supra, 199–200. As we explained in *Moore*, however, although we apply the *Ruth* factors to preserved and unpreserved claims alike, the standard of review is significantly more demanding when a claim is brought pursuant to the plain error doctrine. *State* v. *Moore*, supra, 828 (defendant's burden when claim was preserved is "not as demanding because the court [is] not required to conclude that the error was so clear and harmful that reversal [is] required to avoid manifest injustice"). Indeed, as the defendant recognizes, prior to the Appellate Court's decision in this case, no court of this state ever had reversed a criminal conviction under the plain error doctrine on the basis of a trial

court's failure to give an accomplice credibility instruction. This is no doubt attributable to the fact that, "[i]n order to prevail under the plain error doctrine, the defendant [is] required to establish not only that his conviction . . . affects the fairness and integrity of and public confidence in the judicial proceedings . . . but that it is more probable than not that the jury was misled by the trial court's . . . error into [finding] him [guilty of the charged offenses]." (Citation omitted; internal quotation marks omitted.) *State* v. *Kulmac*, 230 Conn. 43, 74 n.19, 644 A.2d 887 (1994).

On appeal, the state argues that the Appellate Court failed to apply this heightened standard of review in concluding that the defendant had met his burden of establishing a manifest injustice simply by demonstrating that three of the four *Ruth* factors weighed in his favor. The state first contends that only two of the four relevant factors support the defendant's claim. The state further argues that, in any event, to prevail under the plain error doctrine, the defendant was required to establish, at a minimum, that the trial court's omission likely resulted in the defendant's conviction, which, the state claims, the defendant has failed to do. The state also maintains that the Appellate Court, in evaluating harm solely on the basis of the *Ruth* factors, failed to explain why the trial court's omission so undermines public confidence in the verdict and in the judicial proceeding as a whole that a failure to reverse the defendant's conviction would result in manifest injustice. Finally, the state argues that this court previously has determined, in *State* v. *Diaz*, supra, 302 Conn. 103–106, and *State* v. *Ebron*, 292 Conn. 656, 675–76, 975 A.2d 17 (2009), overruled in part on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), that, when the substantive concerns underlying a special credibility instruction are brought to the jury's attention and the jury is given a general credibility instruction, it is unlikely that the omission of a special credibility instruction could be so grievous an error as to constitute plain error.

With respect to the state's first contention, we agree that the Appellate Court incorrectly determined that three of the four *Ruth* factors favored the defendant when, in fact, only two of them weigh in his favor. Specifically, the state argues, with respect to the second *Ruth* factor, that the Appellate Court incorrectly concluded that it favored the defendant because Caban's testimony was inconsistent. More specifically, the state takes issue with the Appellate Court's statement that, "[o]n direct examination, [Caban] indicated that the gun belonged to the defendant but, later, on cross-examination, stated that it belonged to another person." *State* v. *Jamison*, supra, 152 Conn. App. 763. A review of Caban's testimony indicates that, on direct examination, the assistant state's attorney (prosecutor) showed Caban a photograph of the gun found in her apartment

and asked her whether she recognized it. Caban responded that it was "[the defendant's] gun . . . . Well, the gun he was carrying." Later, on cross-examination, Caban testified that she had seen the defendant with the gun in her apartment. In response, defense counsel stated, "as a matter of fact, that gun is not [the defendant's] but is really [another man's] gun, isn't that true?" Caban replied, "Yeah." On redirect examination, Caban clarified that, although the gun belonged to another person, the defendant was the person who was carrying it at the time of his arrest. As the state maintains, when read in context, it is clear that Caban's cross-examination testimony regarding the gun was not inconsistent with her direct examination testimony; her testimony on cross-examination reflects the fact, rather, that, as the questions pertaining to the ownership of the gun became more specific, her answers became more specific. Indeed, even on direct examination, when asked whether she recognized the gun, Caban, after initially stating that it was the defendant's gun, immediately clarified, "[w]ell, the gun he was carrying."

More important, however, we agree with the state that this claim is governed by this court's recent decisions in *Ebron* and *Diaz*, in which we rejected claims that the trial court committed plain error by failing to give, in accordance with *State* v. *Patterson*, 276 Conn. 452, 469–70, 886 A.2d 777 (2005), a special credibility instruction regarding the testimony of a jailhouse informant. In *Patterson*, this court concluded that "an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect." Id., 469. We also concluded that, "[b]ecause the testimony of an informant who expects to receive a benefit from the state in exchange for his or her cooperation is no less suspect than the testimony of an accomplice who expects leniency from the state"; id., 470; the trial court must instruct the jury that an informant's testimony "[should] be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness." (Internal quotation marks omitted.) Id., 465.

In rejecting the defendant's claim of plain error in *Diaz*, we explained that, in *Ebron*, this court concluded that "the trial court's failure to give, sua sponte, a jailhouse informant instruction pursuant to *Patterson* does not constitute plain error when the trial court has instructed the jury on the credibility of witnesses [generally] and the jury is aware of the witness' motivation for testifying [falsely]." *State* v. *Diaz*, supra, 302 Conn. 103, citing *State* v. *Ebron*, supra, 292 Conn. 675–76. In light of *Ebron*, we concluded in *Diaz* that, even though the trial court had a duty to caution the jury regarding the informant's testimony, "the court's failure to do so

sua sponte did not rise to the level of reversible plain error . . . because the trial court gave a general credibility instruction and the jury was made aware of [the informant's] motivation for testifying." *State* v. *Diaz*, supra, 105.

As in *Diaz* and *Ebron*, the jury in the present case was well aware of Caban's motivation for testifying against the defendant. Indeed, the central theme of defense counsel's cross-examination of Caban and closing argument was that Caban had falsely implicated the defendant in order to avoid being prosecuted for the offenses with which the defendant was charged. With respect to that cross-examination, defense counsel questioned Caban in relevant part:

"[Defense Counsel]: And you're claiming that you're not receiving any special treatment for your testimony here today?

"[Caban]: I'm not.

"[Defense Counsel]: You're not, okay. But, at the time of your arrest, you were found to have a gun in your apartment, correct?

"[Caban]: Yes.

"[Defense Counsel]: That explosive [was] in your apartment, correct?

"[Caban]: Yes.

"[Defense Counsel]: And you were never charged with either one of those [possession] crimes, were you? You weren't charged with possession of a gun, were you?

"[Caban]: No.

"[Defense Counsel]: Okay. And you weren't charged with possession of a bomb, were you?

"[Caban]: It was brought up, yeah.

"[Defense Counsel]: But were you ever charged with it?

"[Caban]: I'm not sure. You'll have to ask my public defender.

"[Defense Counsel]: You're not sure what you're charged with?

"[Caban]: I'm not sure if I was charged with [possession of] the explosive or not. I know I was brought up with it. It was a charge, and I'm not sure.

"[Defense Counsel]: Okay."

Following this colloquy, the prosecutor agreed to stipulate that, although Caban initially had been charged with possession of an explosive device, that charge was subsequently dropped in light of Caban's statement to the police that the device belonged to the defendant. Specifically, the prosecutor stipulated that

"right now, as of today, she's not charged with possession of an explosive . . . ." Thereafter, during closing argument, defense counsel argued to the jury that Caban had a powerful motive to testify against the defendant. Specifically, defense counsel stated: "We know that it's her apartment, okay? It's her apartment in which they found the gun, but she wasn't charged with possession of a gun, was she? Oh, that's right, she was at first, but then later [the charge was dropped].

"What else do we know? We know that she wasn't charged with possession of a bomb, even though it was in her apartment.

\* \* \*

"She stated she bought this. She helped make it, but she's not charged with manufacturing . . . a bomb. We know that, originally, she might have been or she was, but she was not [charged at the time of her testimony], but she claims that she did not get anything for her testimony. . . . How could you have all of this evidence found in your apartment and not possess it? And, as a jury, you can say to yourself, that doesn't make sense, and I don't believe it.

\* \* \*

"Caban is an admitted drug dealer. . . . She bagged up cocaine for sale, yet she's pointing to [the defendant], he's the one, not me. It's not my drugs, guns or bombs. I don't know anything. It's him."

Thus, defense counsel argued to the jury that it was highly suspicious that Caban could admit to purchasing, possessing and manufacturing an explosive device but not be charged with any crime in connection with those acts. Her motive to testify, he concluded, "stands for itself . . . and you can take [her motive] into account and say, well, of course she's going to say . . . none of it is hers. What do you think she's going to say, it's all mine?"

Thereafter, in its final charge, the court instructed the jury that "[t]he credibility of witnesses and the weight to be given their testimon[y] are matters which are especially within your [province] to determine. I suggest, however, that you consider some guidelines. No fact is to be determined merely by the number of witnesses testifying for or against it. It is the quality and not the quantity of testimony that controls. There is no such thing as legal equality of credibility. The testimony of every witness is to be weighed for what it seems to you to be worth in light of its character, the demeanor of the witness as it bears on credibility, the substance of the testimony, the probability or improbability that what the witness says is true. The jury is the sole arbiter of what testimony is to be believed and what testimony is to be rejected. This includes the right to [believe] part of the testimony of a particular witness and to reject the remainder. Conversely, you have the right to

conclude that you cannot accept any of the testimony of a witness whom you believe has intentionally lied to you.

\* \* \*

"In weighing the testimony of an expert, you apply to him the same general rules that you apply to all witnesses, such as bias and interest in the case."

In light of the foregoing, we cannot conclude that the omission of the accomplice credibility instruction was so harmful that a failure to reverse the defendant's conviction of possession of an explosive device and manufacturing a bomb would result in a manifest injustice. As we have explained, the fundamental purpose of an accomplice credibility instruction is to impress on the jury that an accomplice's testimony should be closely scrutinized because he or she may be testifying in the hope or upon a promise of leniency from the state. When that concern is brought to the jury's attention, however, as it clearly was in the present case, and the jury is given a general credibility instruction that it is presumed to have followed, we see no reason to conclude that the trial court's failure to give an accomplice credibility instruction likely was so harmful that reversal is the only way to avoid manifest injustice to the defendant and to preserve public confidence in the fairness of the judicial proceeding.

We disagree with the defendant that "Caban's motives for lying were only weakly brought to the jury's attention" and, therefore, that the present case is distinguishable from *Ebron* and *Diaz*. Although defense counsel might have done a better job impeaching Caban's credibility, the jury must be credited with the intelligence to understand the central premise of defense counsel's commonsense argument, namely, that Caban's testimony was not worthy of belief because she was testifying in the hope of receiving leniency—indeed, immunity—from the state. This argument was strongly reinforced by the fact that Caban was not being charged with *any* offense at the time of the defendant's trial, even though she freely admitted to purchasing, possessing and manufacturing the explosive device. We also disagree with the defendant's contention that, because the trial court did not specifically instruct the jury that it could consider the bias and potential interest of lay witnesses, "the court did not give the jury any legal basis to use . . . defense [counsel's] arguments," and, therefore, that the jury would have felt compelled to disregard those arguments "as legally irrelevant." First, contrary to the defendant's contention, the trial court did instruct the jury that it could consider the bias and interest of lay witnesses. Specifically, the court stated that, "[i]n weighing the testimony of an expert, *you apply to him the same general rules that you apply to all witnesses, such as bias and interest in the case.*" (Emphasis added.) Similarly, by instructing the jury that

it was the sole arbiter of credibility and could reject all or part of a witness' testimony for any reason if it believed that the witness was lying, the court necessarily provided the jury with a sound basis for rejecting Caban's testimony if it was persuaded by defense counsel's argument that her testimony was motivated by a desire to save herself from prosecution. Accordingly, we agree with the state that the Appellate Court incorrectly determined that the trial court had committed plain error by failing to give the jury an accomplice credibility instruction regarding Caban's testimony.

## II

We next address the defendant's claim that the judgment of the Appellate Court, which reversed his conviction of illegal possession of an explosive device and of manufacturing a bomb, can be affirmed on the alternative ground that the trial court violated his right against self-incrimination under article first, § 8, of the Connecticut constitution by compelling him to provide a handwriting exemplar. We conclude that it is unnecessary to reach the merits of this claim because, even if we assume, for the sake of argument, that the state constitution prohibits compulsory handwriting exemplars, we are not persuaded that that evidence had any effect on the outcome of the defendant's trial.

The following additional facts and procedural history are relevant to our disposition of this claim. Following the defendant's arrest, but prior to the commencement of trial, the trial court granted the state's motion to compel the defendant to produce an exemplar of his handwriting for comparison with handwriting contained both in the notebook found in Caban's apartment and with a letter that, according to Caban, the defendant had sent to her. At trial, the state's handwriting expert, James Streeter, testified that the handwriting in the letter matched that in the notebook. He also testified that, on the basis of the significant "variations in the letter construction," it was his expert opinion that "the person [who] authored [the exemplar] was in all probability attempting to disguise his writing." Thereafter, in its final charge, the trial court instructed the jury that it could "consider the opinion testimony of . . . Streeter concerning the possibility [that] the defendant may have been attempting to disguise his handwriting when providing the [exemplar solely] in conjunction with the phrase from [the notebook], 'no guns are to stay in the house overnight, none at all, even my own,' as evidence of consciousness of guilt *with regard to the charge of criminal possession of a firearm*." (Emphasis added.) The jury subsequently returned a verdict of not guilty on the firearm charge.

On appeal to the Appellate Court, the defendant claimed that the state had violated his rights under the Connecticut constitution when it compelled him to provide a handwriting exemplar.[7] *State* v. *Jamison*,

supra, 152 Conn. App. 777. Although the defendant conceded "that such protection is not inherent in the right against self-incrimination contained in the fifth amendment to the federal constitution,[8] he argue[d] that the Connecticut constitution's analogous provision affords greater protection than its federal counterpart." Id., 778. The Appellate Court rejected the defendant's claim, concluding, consistent with fifth amendment jurisprudence, that a handwriting exemplar is not testimonial in nature.[9] Id., 778–80.

As we previously indicated, even if it is assumed that the Appellate Court incorrectly determined that article first, § 8, is coextensive with the fifth amendment for present purposes, the defendant makes no attempt to explain, and we cannot perceive, how Streeter's testimony concerning the exemplar prejudiced the defendant with respect to the charges that he illegally possessed an explosive and manufactured a bomb. Indeed, it is clear that Streeter's testimony was not prejudicial even with respect to the firearm charge in view of the fact that the jury found the defendant not guilty of that offense. Moreover, it is axiomatic that, in the absence of any evidence to the contrary, we must presume that the jury followed the trial court's instruction that it could consider Streeter's testimony only as evidence of consciousness of guilt with respect to the firearm charge. See, e.g., *State* v. *O'Neil*, 261 Conn. 49, 82, 801 A.2d 730 (2002) (jury is presumed to follow limiting instructions). Finally, as the state maintains, even without the handwriting exemplar, the state established that the handwriting in the notebook belonged to the defendant on the basis of Streeter's testimony that the handwriting in the letter matched that in the notebook. Accordingly, the evidence derived from the handwriting exemplar was at most additional evidence connecting the defendant to the apartment, and, as such, it could not have affected the jury's verdict on the charges that the defendant illegally possessed an explosive and manufactured a bomb.

The judgment of the Appellate Court is reversed only with respect to that court's reversal of the defendant's conviction of the crimes of illegal possession of an explosive and manufacturing a bomb, and the case is remanded to that court with direction to affirm the judgment of the trial court; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] The defendant also was convicted of illegal possession of a narcotic substance in violation of General Statutes (Rev. to 1995) § 21a-279 (a). The defendant's narcotics conviction is not the subject of this appeal.

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] At trial, the state's explosives expert, David Bland, described the M-1000 as a hollow cardboard tube filled with gunpowder that is sealed at both ends, with "a hobby fuse . . . used as a wick" protruding from one end. Bland further testified that affixing pennies to the M-1000's exterior creates "an improvised explosive antipersonnel device" that is capable of causing serious injury upon detonation.

[4] The total amount of cocaine found in the apartment was 2.94 grams.

[5] Of course, unpreserved claims of constitutional magnitude are reviewed if the four part test set forth by this court in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), is satisfied.

[6] The state contends that the defendant has not satisfied this first prong of the plain error test because it appears that defense counsel may have decided not to seek an accomplice credibility instruction as a matter of trial strategy, and that it cannot be said that the court committed any error, let alone a clear or obvious one, by failing to give an instruction that defense counsel did not want. See *State* v. *Burke*, 182 Conn. 330, 332 n.3, 438 A.2d 93 (1980) (explaining that this court would have rejected defendant's claim that trial court committed plain error in failing to instruct jury that, in accordance with General Statutes § 54-84 [b], no adverse inference could be drawn from defendant's failure to testify, if there had been indication that defense counsel had made strategic decision not to seek that instruction). In support of this claim, the state argues that defense counsel may not have requested an accomplice credibility instruction out of concern that it would undermine any claim that Caban had acted alone. The state also maintains that defense counsel may not have wanted such an instruction because some of Caban's testimony relating to the charges of possession of narcotics with the intent to sell, which were not dismissed until after the state's case-in-chief, was actually helpful to the defendant insofar as Caban testified that the defendant never stored drugs in or sold drugs out of her apartment. Even if we accept the state's characterization of Caban's testimony as favorable to the defendant with respect to those narcotics charges, those charges were dismissed and, consequently, any reason that the defendant may have had, based on Caban's testimony pertaining to those charges, for not requesting an accomplice credibility instruction would have ceased to exist at that time. We also disagree with the state's contention that defense counsel may have elected not to request the instruction because it might have suggested to the jury that Caban actually *had* an accomplice, namely, the defendant. As we explain more fully hereinafter, the defendant's primary claim at trial was that Caban had falsely implicated him with respect to the charged offenses to avoid being prosecuted for those crimes herself. In light of that defense strategy, we see no reason why defense counsel would believe that it would have been advantageous not to have the jury instructed that it should scrutinize Caban's testimony closely in view of her obvious motive to falsely implicate the defendant in the charged offenses.

[7] The defendant sought review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). See *State* v. *Jamison*, supra, 152 Conn. App. 778. Under *Golding*, as currently interpreted by this court, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation exists and deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. *State* v. *Golding*, supra, 239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

[8] The fifth amendment privilege against self-incrimination is applicable to state prosecutions through the due process clause of the fourteenth amendment to the United States constitution. *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

[9] See, e.g., *Gilbert* v. *California*, 388 U.S. 263, 266–67, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967) ("[a] mere handwriting exemplar, in contrast to the content of what is written . . . is an identifying physical characteristic outside [of the] protection [of the fifth amendment]").